MEMORANDUM OF DECISION
On January 19, 2000, the Department of Children and Families, hereafter CT Page 7045 "DCF," filed a petition for the termination of the parental rights of Sheila C. and Wayne R. to their daughter, Melina R. The termination petition alleges that both parents have failed to rehabilitate, so that they could parent their daughter and that they have no ongoing parent child relationship with her. Connecticut General Statutes § 17a-112
(j)(3)(B) and (D). The petition also alleges that both parents were unable and unwilling to benefit from reunification services.
Melina's paternal grandparents were permitted to intervene in the pending action for dispositional purposes only. Thereafter, after assignment of the case for trial, Sheila C. consented to the termination of her parental rights on April 4, 2001. The court accepted her consent as knowingly and voluntarily made with the advice and assistance of competent counsel. (Trombley, J.) The petition was amended to reflect her consent. Trial took place on April 9, 10 and 11 and closing arguments on April 18, 2001. Wayne R. and his counsel vigorously contested the DCF claims and the termination petition. Due to the facts found and for the reasons set forth below, the court grants the termination petition and orders the termination of the parental rights of Wayne R. and Sheila C. The paternal grandparents did not file a motion for transfer of guardianship to them, but intended to support their son in his termination defense or to be potential adoptive resources, should Melina not be returned to him. For the reasons set forth below, the court denies their request.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Wayne R., the father
 A. Events prior to the Order of Temporary Custody
Wayne is now thirty-eight years old and Melina is his only child. Wayne was married to Sheila C., the child's mother, in 1991 and their only child was born on December 1995. Wayne had had a checkered past prior to his marriage. He entered the Naval Service after graduating from a technical high school in Connecticut. He received an other-than-honorable discharge three and a half years later, allegedly based on drug use and addiction. He then returned to Connecticut and worked as an apprentice machine repairman. In 1987, he was arrested for selling drugs and when he refused to cooperate with a two-year drug treatment program in which he was placed, he was incarcerated from June 30, 1987 to January 19, 1988. Upon his release he continued with his apprenticeship and some years later met Sheila C. They began a relationship within days of their meeting and were married as soon as Sheila was divorced from her previous husband. CT Page 7046
For a number of years, he and she lived in Maine and he continued to work in the machine trades. He and Sheila had a very explosive relationship, which was filled with domestic violence on both sides after the first six months. Their relationship not only included constant and continued arguments, but also involved Sheila's repeated threatening of him with a butcher knife. On one such occasion, his response was to punch her in the mouth, after which she required hospital treatment. After some time of continued arguments and fights. Wayne sought out psychiatric treatment with a psychiatrist who placed him on medication. Wayne also began weekly counseling sessions. Wayne sought treatment because he himself had become concerned about his own propensity for violence. The records reflect that he was diagnosed as having Bi-Polar disorder and was prescribed both medication and ongoing counseling, which he attended. In 1995, he and Sheila moved to Maryland and he ended his treatment. While there, Sheila conceived Melina and soon after Wayne's employment in Maryland ended. The couple returned to Connecticut to live with Wayne's parents.
After their return to Connecticut, their relationship grew more violent and eroded further. They left his parents' home and had their own place. Problems, according to Wayne, were being caused by Sheila's older child, Richard S., who was apparently lying and stealing and making referrals to DCF. Sheila's reports about their life during this time are filled with constant and escalating physical violence between them. After Melina's birth, things got worse. In January and February of 1996, there were more incidents of physical violence, with Melina in her mother's arms during one incident when Wayne pushed her to the floor and continued to kick her with Melina present. Finally on March 27, 1996, after another incident of domestic violence during which Melina was again in her mother's arms, DCF invoked a ninety-six hour hold. Then on March 29, 1996 DCF secured an order of temporary custody. Melina has remained in DCF care since that time. On March 6, 1997, she was adjudicated a neglected child and committed to the care and custody of DCF.
B. Reunification with Wayne and Visitation with Melina
During 1996 and 1997, the DCF plan was to reunify Melina with her mother. When that did not appear to be feasible any longer, DCF began those efforts with Wayne. During 1997 and through the summer of 1998, Wayne made commendable progress toward the goal of reunification with his daughter. Indeed one of the therapists involved in a program supporting visitation and reunification began to actively advocate for Wayne. He appeared to be able to interact with Melina and deal with her in an affectionate, appropriate manner. CT Page 7047
Originally Wayne had weekly one-hour visits with Melina at the DCF office. After July, 1998, the visits were increased to one and a half hours, then two hours. Then in October, 1998, based on Wayne's progress, the visits were two hours supervised at Wayne's home. They then progressed to unsupervised visits from 9 a.m. to 4 p.m. with an afternoon playgroup at the McCall Foundation. The DCF social worker assigned to the case testified that sometimes Melina enjoyed playing with her father and other times she would not go to him and wanted to go home. The increased visitation was for a length of time and with a structure that would ordinarily indicate that Melina would shortly be reunified with her biological family.
During this time, Melina also had unsupervised visits with her paternal grandparents and developed a relationship with them. Unfortunately, in November, 1998 Wayne suffered a brain aneurysm and as the social worker testified: "after this, his participation began to wane." Wayne had surgery in early 1999, followed by a period of recovery. He also began vocational retraining, returning to classes as his injuries required him to change jobs. The DCF social worker testified that Wayne appeared both less interested and less focused on his daughter during the recovery time and in the months thereafter. He was also less consistent with his own therapist and she saw a "complete change in his behavior from before 1998 to now."
Despite this, however, Wayne continued to have unsupervised visits at his home on a weekly basis until February, 2000 when "Melina was having a very difficult time following visitation and expressing to her foster mother her feelings of not wanting to attend the visits."[2] At that time, the visits were curtailed to two hours every other week and supervised at the local library. By May, 2000, when Wayne started his new job, his schedule could not accommodate this visitation pattern. He was unable to negotiate a resolution to this impasse or provide his work schedule to DCF. No visits took place between then and October 6, 2000 when visitation restarted at a visitation center supervised by the center's staff every other weekend for two hours.
The parent education coordinator from the McCall Foundation who had been Wayne's advocate for reunification with Melina in 1997 and 1998 testified. She stated that she recalled that in August 1998, Wayne and Melina went on a hayride where she saw excellent interaction between the two. She noted that this was "the high point in their relationship, "as she observed it. She stated she did not see him for a period of time and the play group sessions with Melina in the fall were awkward and difficult. "Wayne's attendance was not so good in the fall and there were times when he arrived too early and left early as there was no play group there ready for them." She commented that as time went along, she saw the CT Page 7048 bond between Wayne and Melina deteriorate.
By March, 1999, she sent a letter to DCF setting forth her concerns. She testified that Wayne did not praise Melina. Others reported that he was impatient and autocratic. Wayne had dropped out of the support group, the playgroup and the parenting program. She knew that he wanted to be in Pennsylvania with a girlfriend. She testified that this "made me concerned [as he] was not that interested in being with the child." She noted that in the fall and early winter of 1998, there were "times that Melina did not want to continue." She was "pouty, weepy, and she would go to the door and say she wanted to go home. Wayne was frustrated and not that happy to be there. He did not seem to be comfortable."
C. Professionals Evaluations
DCF went to some lengths to determine the psychological implications of Wayne's history of violence against his wife Sheila, his previously diagnosed psychiatric disorder and his neurological disorder, which included the recent life-threatening insult to his brain. In May and early June, 1999, Dr. Logan Green performed a neuro-psyhological examination of Wayne, which had as its purpose to examine whether there were physical problems in his brain which were causing difficulties for Wayne. "If there had been indications of such difficulties, rehabilitation could then occur to remediate those problems," Dr. Green testified. He noted that "often times lack of social restraint is a function of insults to or deficits in the brain." He determined, after his examination, that the implicated parts of Wayne's brain were functioning well. After completing a battery of tests, Dr. Green noted in his written report[3] that:
 "There is no neuo-psychological reason to predict violent behavior on Mr. R. "s part. It is likely that some of his past aggressive behaviors dating back to childhood, were the result of his (then) untreated Bipolar disorder. This is a disorder that can result in states of extreme anger and in irritability that are unpredictable. In no sense, however could this be the only cause of his past violence. . . . For example his own way of engaging the world is rather egocentric. He finds it difficult to put himself in other's shoes."
Wayne was also evaluated by a court-appointed psychiatrist. This was done to clarify Wayne's psychiatric diagnosis and the appropriateness of his treatment. His diagnosis remains "Bipolar Disorder not otherwise specified." Dr. Krulee testified that a combination of medication and CT Page 7049 counseling is appropriate for Wayne. He noted that this is "a life-time illness you do not recover from. ". . . Not having any mood-stabilizing medication is serious as it is unlikely for someone to go more than three years without a relapse." He testified that Wayne lacked insight into his disorder and that he had concerns that Wayne would maintain his medication regimen and continue to behave in a safe and nurturing manner to a child. He testified that the prognosis for some one with this illness does not rule out that such a person could not parent a child. However, that prognosis "is largely based on compliance with mediation and blood level monitoring of the mood stabilizer and a level of insight and participation in treatment." The prognosis is the "opposite for those exhibiting some denial of the illness." He also noted that "such denial is a feature to the disorder as many believe that they have beaten it and could put it behind them."
Dr. Krulee's evaluation was completed in August of 1999. In his written report, he noted that Wayne's
 "pattern of impulse control difficulties and mood problems . . . would not be unusual for someone with an undiagnosed Bipolar Disorder. Frequently, Bipolar Disorder begins in adolescence . . . and there is a long latency between the onset of symptoms and the correct diagnosis. Bipolar disease is a life-ruining
disease in that the individuals so afflicted often have considerable impulse control difficulties that reek social havoc upon themselves prior to the initiation of treatment. "[4] (emphasis added).
The entire family was extensively psychologically evaluated by Dr. David Mantell with the first of six court-ordered sessions in May, 1996 and the last completed in June, 2000. Included in the evaluation process were Melina's paternal grandparents. Dr. Mantell testified concerning his conclusions. He stated that when he first saw Wayne "I thought that he had a positive rehabilitation potential despite the bleak set of circumstances that surrounded his life in the years prior to me meeting him." When he next saw Wayne in July, 1998, he was "more sanguine about rehabilitation. By then some of the issues in his personality came into better profile." He thought that Wayne's rehabilitation "capacity was borne out by the dramatic and progressive progress that he did make." He noted that the issues were "then the more subtle and underlying issues, his ability to relate parentally to a child and to develop a successful close emotional relationship with another person other than his mother."
In October, 1999, Dr. Mantell completed the most extensive review and evaluation including an assessment of Wayne's parents. He concluded that CT Page 7050 Wayne:
 "is not able to sustain a parent-child relationship to his daughter even with access, assistance and training. He has shortcomings of patience, attention span and interest level in maintaining contact that are such that he is comfortable allowing others to relate to her. . . . I do not think that he wants the live emotional responsibility of the continuing moment to have to relate to a child with primary attention to her needs, because this is very exhausting."
He testified that to a reasonable degree of psychological certainty, Wayne could not be a constructive parent for Melina. Further, he was "not successful in establishing a parent-child bond with his daughter." He saw this as an ambivalent relationship and as fairly superficial. He noted that the relationship had been more intense in 1998, but that it had deteriorated. This had paralleled his "lack of course attendance and the child's growing more reactive to visitation." Based on these findings and due to the length of time Melina had been out of her father's care, Dr. Mantell concluded that it was in the best interests of this child to have Wayne's rights to her terminated "to free her up for a permanent plan."
Sadly for Wayne, the conclusions reached by the first psychiatrist to evaluate him in 1996 have now become the reality. The first court appointed evaluator, Dr. Walter Borden, in 1996, some months after Melina had been removed from her parents, noted that:
 "both Sheila and Wayne R. have deep-seated chronic psychiatric problems. While both are currently involved in their separate psychiatric treatment and appear to be doing relatively well, the nature of their problems preclude either one having full custody of their child, Melina.
 . . . Although each is seemingly doing well, the nature of their problems are such that it will take a period of at least one to two years to determine stability and if the seeming changes promise to be long lasting. "[5]
The court finds that such stability has not been achieved nor have the changes that Wayne had made by 1998 been long lasting.
D. Claims made by Wayne R. CT Page 7051
Wayne testified on his own behalf and called several witnesses. He spoke of the various programs he had attended and the things he believed that he had learned. It is his plan, if reunified with Melina, to return to live with her in his parents' home. They will help him care for her. He believes that he has met the expectations that DCF has set for him and that he has rehabilitated. On the issue of his relationship with Melina, a visitation worker from the center where he now has supervised visitation with Melina one hour a week testified. She reported concerning her observations. She stated that Melina and Wayne "play, laugh and smile. He brings a snack." She responded in the negative to a question about whether she observed any reluctance on Melina's part to be with her father. She noted that Melina runs to her father, and hugs and kisses him. His mother also testified on his behalf. She confirmed that Melina was happy to visit with her father during the time that she observed those visits. She confirmed the joint plan to care for Melina. She stated that she had a bedroom set up for Melina and a separate bedroom for Wayne as well. The court finds that this evidence is not inconsistent with the testimony of and the conclusions reached by the experts both that his relationship with Melina had deteriorated and that it is relatively superficial.
In support of his claims, Wayne introduced a letter written by his therapist at the Northwest Center for Family Service and Mental Health regarding his work in a program for parents with mental illness. The letter is dated October 6, 1998 and in it the therapist, Robyn Hawley stated:
 "Wayne achieved the goal of increased understanding of his mental illness. He has a clearer understanding of what his illness is, how it affects him and the importance of staying on mediation. He also succeeded in achieving the goal of setting and enforcing rules with love. . . . This writer observed Wayne implement the rules of staying in the visiting room and not throwing toys in several observed visits with his daughter." (emphasis added)[6]
The court notes that if one goal of the therapy was to make sure that Wayne did not throw toys while visiting with his daughter, he still had considerable parenting learning to accomplish. This observation by the therapist was made at around the time Wayne had made maximum progress on his parenting skills as testified to by the parent-educator from the McCall's Foundation. From this, the court finds that Wayne, even at his maximum level of improvement, was not yet ready to be a full-time parent to his daughter. CT Page 7052
Wayne testified about his medication regimen for treatment of his Bi-Polar disease. All of the experts who testified at trial highlighted the importance for Wayne of continued counseling and medical blood checks for the level of medication in his system. They also spoke about the fact that many individuals suffering from Bi-Polar disorder believe that they do not need to continue with treatment once their symptoms abate. Wayne confirmed that he is one of those individuals, as he has stopped taking his medication. He further confirmed, as did a letter from his counselor, that he had stopped attending counseling sessions last year. The court concludes that whatever progress he had made in "achieving an increased understanding of his illness" while in Ms. Hawley's sessions was short-lived.
Wayne testified that he believed he would be able to recognize the recurrence of his symptoms and know enough to seek help as he had in the past. He spoke of the things he had learned since he first sought out treatment in 1995. He provided the details of an incident at work in which he knew enough to walk away when things were getting heated and then return later to resolve the matter with a co-worker. To his therapist, he had reported that he was "more mellow" since his surgery. Nonetheless, she noted that "he continued to be dissatisfied with his job choices and has problems with close relationships, which are long standing issues for him."
Her letter is telling in what it does not say. It notes that "At this point, [Wayne] does not believe that he needs to be in therapy and no further visits have been scheduled. "[7] An opinion on her part that Wayne's position is consistent with her own as his medical provider and counselor is carefully avoided in the letter. The court notes that Wayne is fortunate that no significant reoccurrence of his symptoms has taken place. The court, however, finds, based on the expert testimony, that Wayne's failure to follow his prescribed medication regimen and counseling sessions heightens the risk as far as his daughter is concerned. It also, the court finds, confirms a pessimistic prognosis for the course of his disease, as Dr. Krulee testified. The court concludes that Wayne had not yet achieved an understanding of his illness.
As to Wayne's claim of having made significant progress towards meeting the court expectations that were set for him, the court finds that he has not fully complied and has not successfully been able to accomplish the steps set for him. Those steps were set on March 6, 1997. Wayne was ordered not to engage in any substance abuse, which to his credit he had accomplished. He was also able to comply with the ordinary frequently ordered obligations of keeping his whereabouts know to DCF and keeping his appointments with DCF. However, Wayne was required to participate in counseling including parenting and individual counseling and to CT Page 7053 demonstrate an understanding of the techniques taught and the child's needs.[8] He was and is unable, the court finds from the clear and convincing evidence, to accomplish this crucial step. Even though he made commendable progress in 1997 and 1998, he did not continue that level of involvement. While it may appear that there is some linkage between Wayne's aneurysm and his inability to maintain his relationship with Melina, Wayne does not assert this claim as no such connection has been demonstrated. The various expert evaluators also spoke to such a connection and found none. Rather, in the fall of 1998, before his illness struck, when it became clear to Wayne that Melina might be returned to him as a full-time parent, it appears as though the prospect was too daunting for him. Other interests and concerns then gained primacy in his life, to the detriment of his connection to his daughter. In the late fall of 1998 and spring of 1999, he did not visit with Melina as frequently as he was permitted, another specific step that was court-ordered. As a consequence of all of these events, to the extent Wayne was able to establish a satisfactory relationship with his daughter for a short period of time, he could not maintain it on any sustained basis. The court also finds, from observing Wayne and hearing his testimony, that he remains unable to fully understand and appreciate his daughter's needs, no matter how much he may love her.
E. The Paternal Grandparents
The paternal grandparents were permitted to intervene and to present dispositional testimony on their own behalf. They were not represented by counsel. Wayne's father spoke of his memories of his own mother and how significant it was to him that she was always home when he came home from school. He stated his belief in the importance of blood-related families. He testified that if Wayne had Melina in his care, he and his wife would be receptive to whatever DCF wanted them to do. He also testified that if Wayne did not receive Melina, he and his wife wished to adopt the child.
Wayne's mother, Melina's grandmother, also testified. She spoke about Melina and the visitation that they had been permitted with her. She noted that Melina was a very smart child who knows them and knows her father. She, like her husband, believes in the importance of blood ties and believes that they could be "a real family." She spoke of her other grandchildren and how close a family they have been. She stated that she would permit contact between Melina and her foster mother. At the present time, the grandparents continue to have visitation with Melina two times a month for four hours unsupervised. A condition of their visitation is that Wayne cannot be present and that issues about the pending case and DCF should not be discussed with Melina. The grandparents have apparently met these conditions. The visitation has gone well for the most part. The CT Page 7054 social worker did observe, as did the court from their testimony that "the paternal grandparents do not appear to understand Melina's attachment to her foster family [and] fail to understand the significance of her bond with this family."
Melina's grandmother spoke of the fact that she would permit contact between Melina and her foster mother if Melina was returned to Wayne or they were permitted to adopt her. Nonetheless, she was extremely critical of the foster mother's care of the child, both when Melina was significantly younger and at the present time. Given the court's findings below concerning Melina and the fact that she has been in her present foster home since she was less than three months old, the court does not credit this testimony.
It was apparent in the grandparents' testimony and the conclusions reached in the evaluations in which they were involved, that the grandparents were unaware of the level of violence between Wayne and Sheila, and in particular Wayne's role in that violence. Neither seemed to have any understanding about the ramifications of Wayne's mental illness or the details both of its treatment as well as the behaviors Wayne might exhibit if his symptoms reappeared. While his parents have developed and sustained a more supportive and nurturing relationship with their granddaughter than her father was able to establish, they have sought to participate in these proceedings as a support to Wayne, without examining the details and necessary implications of such a role. They have not asserted an independent role for themselves except to say that they would be willing to adopt Melina if she is not returned to her father. They have also not filed a motion for transfer of guardianship of this child to them.
2. Melina R., the minor child
Melina is now five years old and will be six in December of this year. She has not lived with her parents since she was three months old. She has been in DCF foster care since that time and has lived with the same foster family. Melina experienced some developmental difficulties in her first few years of life. Dr. Mantell found that the "child's condition creates concern because of her continued, disturbed self-regulatory pattern. "[9] At that time Melina, according to the foster mother's report to Dr. Mantell, was having difficulty eating and sleeping, was hard to comfort and cried excessively. When Dr. Mantell evaluated Melina again in April, 2000, she was four years and four months old. He noted that "she is a much more secure and independent child than when I last saw her."[10] He noted in his report that "a warm relationship and a close one was also seen between the foster mother and child." He had earlier found that the foster mother was Melina's psychological parent. CT Page 7055 In his summary, he concluded that:
 "Melina presents as an increasingly secure, psychosocially competent, alert, friendly, serious and affectionate child with strong attachments to a number of people and important personality resources. . . . She has clear preferences and aversions and shows a healthy ability to give expression to her feelings and views.
As to Wayne, Dr. Mantell noted in that same report that "the decline in his parenting program participation seems also to have paralleled a decline in his relationship with Melina who is not hostile toward him but who is wary and cautious in her interactions with him."
Joseph Ubaghs, Melina's therapist since October, 1998 testified. He was in opposition to the increased visits that Melina had at that time with her grandparents and her biological father. In a written report to DCF dated February 10, 2000, he stated that Melina never established a parent-child bond to support reunification. He noted that the DCF records themselves demonstrated over four years of problematic visits, which caused distress and confusion to Melina. He stated:
 "Melina believes that her foster family is her real family . . . Melina consistently verbalizes that she dislikes her bio-dad and does not want to visit. DCF reports document the confusion, instability and behaviors precipitated by the bio visits. . . . When Melina is encouraged to talk about her father, she shies away, physically moved to the end of the room and will not speak, but as soon as she is asked about some other issue she brightens up and immediately responds."[11]
He concluded that continued visits were not in her best interests because of her confusion and felt this it could lead to severe psychological implications. He also made reference to a letter written to DCF by the director of "Creative Kids," a preschool program where Melina was enrolled in 1998 and 1999, which supported his findings and opinion.[12]
During his testimony, Mr. Ubaghs noted that since he wrote his report, some things about Melina's behavior have changed. Melina no longer physically moves away when the subject of Wayne is raised, but she has nothing to say. She does not bring up the subject herself nor does she speak of her grandparents. He stated that he does not directly ask her where she would like to live, but he did on occasion ask her to draw him CT Page 7056 a picture of her family. "Her response is sometimes to look at me in amazement when the thought of any other parent comes into play." He reported that she said to him, "you silly goose and then pointed to her foster mother outside the room."
He also stated that in his opinion her grandparents are manipulating her. Melina reported to him that her grandparents had told her that she could live with them. He testified that her reaction was one of amazement and questioning. In his opinion the child felt "they cared about her and she did not know why they could want her when she has a home of her own." When questioned about cessation of visitation with her father, Mr. Ubaghs stated that in his opinion, Melina would have no reaction or major adjustment to make. With respect to her grandparents, there would only be a minor adaptation as she is still trying to "figure out who they are in her life."
Melina's foster father with whom she was very close unexpectedly died in December, 1999. She has experienced grief and confusion about this, Mr. Ubaghs noted in his letter report. In early 2000, he noted the foster father "in her mind was her real father." He recommended that the foster family be allowed to adopt Melina as she "knows and believes this family as her own . . .
The DCF social worker also testified to the close and nurturing relationship Melina had with her foster mother. In the fall of 2000, Melina entered kindergarten and "appears to have made many friends and enjoys school."[13] She noted that the school system believes there to be a possibility that Melina may have some learning disabilities, which the system will address after testing when she is a year older. She testified that Melina is "intelligent, determined and stubborn. She is very sweet and shy at times."
 B. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds that the parent is unable or unwilling to benefit from reunification services . . . Connecticut General Statutes § 17a-112
(j)(1). The petition alleges that Wayne R. is unwilling and unable to benefit from reunification services. The court finds from the clear and convincing evidence that Wayne has been unable to benefit from the many services and the extraordinary visitation time and assistance that DCF has provided to him. The court finds that the many services that were CT Page 7057 offered to him were more than reasonable, from the clear and convincing evidence, but that despite his best efforts he was unable to benefit from them on a long-term basis.
2. Adjudicatory findings
 (a) Failure to Rehabilitate
Melina was adjudicated a neglected child on March 6, 1997 and was committed to the care and custody of DCF. The court further finds, by clear and convincing evidence, that as of January 19, 2000, Wayne R. had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of his daughter, he could assume a responsible position in her life. Connecticut General Statutes § 17a-112 (j)(3)(B). While he has been actively involved in seeking Melina's return to his care, he has been unable to benefit from reunification services and not demonstrated any meaningful rehabilitation. To his credit, he has refrained from engaging in any violent acts or any episodes of substance abuse. But he has in the past two years neglected to deal with his mental illness and his prognosis for a reoccurrence of symptoms remains high. While he is able to verbally state some of the parenting and other concepts that he has learned in the various programs he attended, he has not internalized them to change his more subtle behaviors. The court concludes from the clear and convincing evidence including his own testimony that Wayne is unable to understand his child's needs.
 "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable tune. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life . . . In re Sheila J., 62 Conn. App. 470, ___ A.2d ___, (2001), citing In re Eden F., 250 Conn. 674, 706, 741 A.2d 873 (1999).
Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the CT Page 7058 court must consider not only the parent's conduct prior to the filing of the petition, but also his conduct since that time. In this case, this was a period of over one year, during which time there has been no change in his connection to his daughter or his parenting capacities.
(b) No Ongoing Parent-Child Relationship.
DCF has alleged a second ground for the termination of the parental rights of Wayne R., which is that there is no ongoing parent-child relationship between him and his daughter. In considering the question posed concerning the legal issues presented by this section of the statutes:
 "In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted; internal quotation marks omitted.) In re Tabitha T., 51 Conn. App. 595, 602, 722 A.2d 1232 (1999). In Re Shane P., 58 Conn. App. 234, 240, ___ A.2d ___ (2000).
In this case, Melina does not have feelings for Wayne as her father while she knows him and now attends visitation without her earlier difficulties. The court finds, from the clear and convincing evidence, that this aspect of the statutory criteria has been met. In addition:
 "The court must first make a determination that no parent-child relationship exists and then, if that is so, it must determine if, in the future, the child's best interest would not be served by allowing time for the establishment or reestablishment of the relationship." In re Migdalia M., 6 Conn. App. 194, 211, 504 A.2d 532 (1986)
The court credits the testimony of Dr. Mantell that there is no parent-child relationship between Melina and her father, although there remains a visiting relationship. The court finds, from the clear and convincing evidence, that it is a superficial relationship. Given the fact that Wayne is further away from establishing a parent-child relationship with Melina than he was in mid-1998, the court finds from the clear and convincing evidence that to permit further time to elapse to see if such a relationship could be established is not in Melina's best interests. Melina is closely and warmly attached to her foster mother and this has been and remains her primary sustaining and "parental" connection. Her foster mother and her family are Melina's CT Page 7059 family in the child's understanding and life. They have nurtured and raised her. The court concludes from the clear and convincing evidence that this ground has been proven.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (k).
(1) Appropriate and timely services were provided by DCF to the family. Wayne received services well designed to address the complex issues in his life. He received parenting education, anger management training, supported play group attendance and significant visitation, both supervised and unsupervised.
2) As previously noted, the court finds by clear and convincing evidence, reasonable reunification efforts were made by DCF and that Wayne was unable to benefit from them.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Wayne in the earlier neglect proceedings.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. The court has detailed above Melina's relationship to her foster mother, in whose family she has resided since she was three months old. She knows no other family as her own and resists any notion that her family is her biological father and her paternal grandparents. She does not, the court finds, find her contact with her father meaningful.
5) Finding regarding the age of the child: Melina is now five years old. She will be six on December.
6) Finding regarding efforts of the parent to adjust his circumstances, conduct or conditions to make it in the best interests of the child to return her to his home in the foreseeable future and (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with him provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that Wayne, despite his best efforts, is unable to adjust his life CT Page 7060 so that he would be able to care for Melina in a parental and emotionally appropriate manner.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parents. There was no evidence of such conduct and the court so finds.
 D. DISPOSITION 1. The Grandparents' Claims
The court will first consider the grandparent's claims. They have requested, if Wayne does not receive Melina, to adopt Melina themselves. The statutory framework permits the court to grant specific types of relief in a termination of parental rights case. The relief available includes appointing DCF or some other state licensed child-placement authority the statutory guardian or transferring guardianship of the minor child to others, if the court concludes that is in the child's best interests. The court, however, under the statutes is not authorized to make the permanent adoption placement decision.
Even assuming that the grandparents' claims should be treated as a motion for transfer of guardianship to them, the best interests of Melina remain the primary issue. The court cannot find, given the evidence at trial, that it is in Melina's best interests to be placed in the home of her grandparents. As detailed above, the court has found that they do not understand or appreciate the difficulties caused by Wayne's mental health issues or his inability to become a parent to his child. The court further finds that the grandparents "could not, from the court's observations, place the [child's] needs ahead of their own needs for family integrity." In Re Felicia B., 56 Conn. App. 525, 527, 743 A.2d 1160. The court further finds that the grandparents do not see any significant emotional issues for Melina in having Wayne participate in her life as her parent. The court also remains skeptical about the grandparents' ability to assist Melina in maintaining her ties to her foster mother. But most significantly, the court concludes from all the evidence that it is not in Melina's best interests to order that the family that has nurtured her and been her "family" in all but the biological sense be supplanted by another family, simply because of the blood ties between them.
2. Best Interests of Melina re Termination of Parental Rights
CT Page 7061
In hearing a termination of parental rights cases the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the child at issue.
 "If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether the termination of parental rights is in the best interests of the child. The dispositional phase, like its adjudicatory cousin, also must be supported on the basis of clear and convincing evidence. In re Alissa N., 56 Conn. App. 203, 208, 742 A.2d 415 (1999) (internal citations omitted).
The court has found that both statutory grounds alleged against Wayne R. have been proven by clear and convincing evidence. The court has made the seven statutory findings required, which weigh in favor of termination being in Melina's best interests. The court concludes, from the clear and convincing evidence, that Melina deserves to have permanency in her foster mother's home. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276, 455 A.2d 1313
(1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ."In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of Melina that her parents' rights to her be terminated.
The court therefore orders that the parental rights of Sheila C. and Wayne R. are hereby terminated. The court approves of the present permanency plan for Melina. The court appoints the Commissioner of the Department of Children and Families as the statutory parent. The court further orders that a permanency plan for Melina be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session