IN RE ALISSA N.*
(AC 18596)

Lavery, Spear and Daly, Js.

Argued September 21—officially released December 28, 1999

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*William A. Snider*, for the appellant (petitioner).

*Sam Christodlous*, for the appellee (respondent).

*Opinion*

LAVERY, J. The petitioner grandmother appeals from the judgment of the trial court denying her petition to terminate the respondent mother's parental rights. The petitioner claims on appeal that the trial court improperly (1) denied her petition to terminate the respondent's parental rights and (2) relied on the opinion of counsel serving as guardian of the child's estate in determining the child's best interest pursuant to General Statutes § 45a-717 (g). We affirm the judgment of the trial court.

On April 8, 1996, the petitioner brought an application for termination of the parental rights of the mother and the father of Alissa N. in the Newington Probate Court. On that same day, the petitioner also moved for immediate temporary custody and guardianship pending a hearing on the merits, which was granted by the Probate Court. The respondent mother did not contest the temporary orders, but did seek visitation. After a hearing, the Probate Court on February 24, 1997, terminated the father's parental rights and on June 10, 1997, terminated

the mother's parental rights.[1] The respondent mother appealed from that decision to the Superior Court. After a trial de novo, the court granted the petitioner guardianship, denied the petition to terminate the mother's parental rights and granted limited visitation rights to the mother. The petitioner appealed to this court.

The trial court found the following facts relevant to this appeal. Alissa was born on June 10, 1985, the product of a brief and abusive relationship between the respondent and Alissa's father. Alissa is a Down's syndrome child who also suffers from Eisenmenger syndrome, a condition that significantly reduces her life expectancy. Alissa was born with a heart defect—in layman's terms a hole in her heart—which causes pulmonary hypertension and a complex of symptoms such as iron deficiency, risk of stroke, bone pain, pain in the arms and debilitating headaches. Alissa's disabilities require constant care and supervision.

When Alissa was born, the respondent was eighteen years old. Although the respondent was the primary caretaker for the first six months of Alissa's life, she was so overwhelmed by her situation and that of Alissa that she had difficulty maintaining the high level of care necessary to meet her daughter's needs. The respondent was also interested in dating and continuing her life as an adolescent. As a result, over the first year of Alissa's life, her grandmother, the petitioner, assumed the day-to-day care and responsibility for Alissa's medical needs.

For approximately ten years, that arrangement continued.[2] The petitioner had to make day care arrange-

---

[1] The father did not appeal from the Probate Court decision.

[2] In 1989, the petitioner sought guardianship of Alissa and the respondent voluntarily signed the application. The application filed in the Probate Court was on an incorrect form and no order entered. Neither the petitioner nor the respondent took any action until seven years later to clarify Alissa's legal status, thereby permitting the status quo to continue, with the petitioner in the parental and controlling role.

ments during Alissa's infancy because the respondent could not be trusted to care for her. The petitioner also devoted her life to Alissa's educational and medical care needs.[3] The petitioner, not the respondent, provided for Alissa financially.

During most of that period, the three lived in the same apartment. The respondent participated in Alissa's care only tangentially, more as an older sister might, rather than a mother. She would watch Alissa from time to time, but did not contribute to daily care.

In 1995, family circumstances changed. The respondent filed a medical malpractice lawsuit on Alissa's behalf regarding Alissa's condition, which promised a substantial monetary settlement. The relationship between the petitioner and the respondent deteriorated. In April, 1995, the respondent moved out of the shared apartment, and Alissa remained in the petitioner's care. The respondent did not visit or otherwise significantly participate in Alissa's life.

The relationship deteriorated further when the petitioner filed an application for temporary guardianship and termination of parental rights. The respondent did not contest the guardianship order in favor of the petitioner, apparently hoping that this disagreement, like others previously, would pass and she would be able to see Alissa. Their relationship did not improve and the respondent has not seen Alissa since November, 1995, when the petitioner stopped working at the bus company where the respondent continues to be employed.

Karen Brinkman, a department of children and families social worker, prepared the mandated study for the

---

[3] For example, the petitioner made all arrangements for Alissa's special education services. The petitioner secured a one-on-one aide to assist Alissa in the classroom. The respondent did not participate in the special education agreements and admitted she was not familiar with Alissa's teachers or her progress in school.

court and testified. She stated that no ongoing parent-child relationship exists between the respondent and her daughter. She found that the respondent was not, in December, 1996, in a position to make a home for her child. She recommended termination of the respondent's parental rights and adoption of Alissa by the petitioner.

I

"The standard for review on appeal [in a termination of parental rights case] is whether the challenged findings are clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Roshawn R.*, 51 Conn. App. 44, 51, 720 A.2d 1112 (1998).

A

The petitioner's first claim is that the trial court improperly denied the petition to terminate the respondent's parental rights when it concluded that it was not in Alissa's best interest to do so. The petitioner contends that the court's conclusions are not factually supported and are an improper application of the law. We disagree.

Nonconsensual termination proceedings involve a two step process: an adjudicatory phase and a dispositional phase. General Statutes § 45a-717 (g). "In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence." *In re Tabitha P.*, 39 Conn. App. 353, 360, 664 A.2d 1168 (1995).

Examples of such statutory grounds are abandonment of the child by the parent, denial of care, guidance and control necessary for the child's well-being or no ongoing parent-child relationship. *In re Bruce R.*, 234 Conn. 194, 204, 662 A.2d 107 (1995). "If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether the termination of parental rights is in the best interests of the child. *In re Maximina V.*, 44 Conn. App. 80, 82–83, 686 A.2d 1005 (1997). *In re Drew R.*, 47 Conn. App. 124, 127, 702 A.2d 647 (1997)." (Internal quotation marks omitted.) *In re Lauren R.*, 49 Conn. App. 763, 768, 715 A.2d 822 (1998). The dispositional phase, like its adjudicatory cousin, also must be supported on the basis of clear and convincing evidence. *In re Bruce R.*, supra, 204.

The petitioner focuses her challenge on the dispositional phase, which she invites us to interpret as permitting the denial of termination only when a "compelling reason [exists] to keep the parent in the child's life." The petitioner also posits that the court may deny termination of parental rights at the dispositional phase only if it is done with the purpose of encouraging no less than a full parental relationship.

Neither contention finds support in the law. "The trial court is vested with broad discretion in determining what is in the child's best interests. *Presutti* v. *Presutti*, 181 Conn. 622, 627, 436 A.2d 299 (1980); *Ridgeway* v. *Ridgeway*, 180 Conn. 533, 541, 429 A.2d 801 (1980)." *Schult* v. *Schult*, 241 Conn. 767, 777–78, 699 A.2d 134 (1997). Conducting a best interest analysis is not a narrow concept restricted to a compelling reason or to fully reuniting the parent with the child. Rather, it is "purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." *In re Bruce R.*, supra, 234 Conn. 206. Indeed, "General

Statutes § 45a-706 expressly provides that § 45a-717 shall be liberally construed in the best interests of any child for whom a petition has been filed . . . . See *Guille* v. *Guille*, 196 Conn. 260, 266, 492 A.2d 175 (1985) . . . ." (Citation omitted; internal quotation marks omitted.) *In re Bruce R.*, supra, 206.[4]

Not only is the dispositional phase free from the constraints the petitioner asks us to place upon it, but explicit guidelines already exist for a trial court to follow. General Statutes § 45a-717 (h). "In the dispositional phase of a nonconsensual case, when the focus is on the best interest of the child, General Statutes § 45a-717 (h) requires the trial court to consider and make written findings on certain specified criteria. Among these criteria, the trial court must consider whether the economic circumstances of the parent have prevented [that parent] from maintaining a meaningful relationship with the child." (Internal quotation marks omitted.) *In re Bruce R.*, supra, 234 Conn. 204–205. These factors, combined with the broad concept of the best interest of the child, establish the proper factors to be considered in the dispositional phase of a nonconsensual parental termination proceeding. Accordingly, we reject the petitioner's restrictive view of the dispositional phase and affirm the trial court on that issue.

B

The petitioner also questions the factual grounds on which the trial court reached its conclusions. The petitioner challenges the court's conclusions that (1) the

[4] Although the petitioner urges us to construe strictly all statutory provisions regarding the termination of parental rights; see *In re Jessica M.*, 217 Conn. 459, 466, 586 A.2d 597 (1991); such strictness in nonconsensual proceedings functions as a shield against improper interference with a parent's constitutionally protected interest in maintaining a relationship with her child, not as a sword to cleave away parental rights from a biological parent. See *In re Bruce R.*, supra, 234 Conn. 206–207.

child's need for permanency does not require termination of parental rights, (2) it is appropriate for the respondent to remain in Alissa's life, (3) it is not in the best interest of the child to terminate the respondent's parental rights and (4) Alissa will benefit from the respondent as a visiting resource. We conclude that the court adduced sufficient evidence to sustain its factual findings.

We note that the trial court has an ability superior to our own to evaluate the evidence because of its firsthand opportunity to observe the parties and to hear their testimony. *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 772, 717 A.2d 150 (1998).

Although the petitioner states four claims of factual insufficiency, they ultimately arise out of the core issue of whether the court articulated sufficient factual findings to conclude that denying termination of the respondent's parental rights was appropriate.

The trial court's denial of the termination of the respondent's parental rights is supported by the evidence. Alissa has continued to live with the petitioner since infancy. Everyone who testified, even the respondent herself, acknowledged the bond between Alissa and the petitioner. The respondent's presence does not challenge the relationship between Alissa and the petitioner nor does it threaten Alissa's currently stable environment. Further reasoning is best stated directly from the thoughtful opinion of the trial court: "There are circumstances where parents, through various acts, have lost their connection to their children and new connections are in the process of being established by their children with others. For these children, permanency is necessary and a continued, even limited connection to their biological parents can and does disrupt such permanency. Permanency is also desirable for Alissa, but she has had such permanency with the con-

tinued and assured care from [the petitioner] since infancy. There is no parental connection which previously existed and has now been disrupted. Seeing [the respondent] will not prevent or inhibit the primary attachment Alissa has to [the petitioner]. For a child whose future is uncertain and whose care requirements are extraordinary, the more people who know about her and are concerned about her, the better. . . .

"There has been no evidence that [the respondent's] limited contact with her daughter was unpleasant or harmful to the child. What is abundantly obvious is that such contact was unwanted by [the petitioner]. There is also no question that [the respondent] did not exhibit the concern which would ordinarily be exhibited by a parent, but she did exhibit some concern. As the court has noted, her involvement is more akin to an acquaintance or an older sibling. Alissa does not benefit from being totally isolated from all those family members previously connected to her."

The trial court's thorough memorandum of decision reflects a careful and extensive review of the evidence on which it relied in the adjudicatory and dispositional phases of the termination proceedings. The court's findings and analysis, based on the best interest of the child, constitute more than sufficient evidence to conclude that the respondent should not lose her parental rights and should be allowed at least a minimal amount of contact with Alissa over time.[5] The court's analysis stands solidly within the broad discretion given within the clearly erroneous standard and we will not disturb

[5] We also note that "[r]ecent studies of children in long-term foster care have provided evidence that suggests that 'continued contact with the natural parent generally promotes the child's sense of well-being and emotional security' even for 'children who were separated from their parents at a very early age and whose subsequent contacts with their parents are sporadic.' M. Garrison, 'Why Terminate Parental Rights?' 35 Stan. L. Rev. 423, 461 (1983)." *In re Jessica M.*, 217 Conn. 459, 466 n.5, 586 A.2d 597 (1991).

it. Thus, we conclude that the court's factual findings contested by the petitioner were not clearly erroneous.

## II

The petitioner next contends that the trial court improperly relied on the opinion of Stephen Ayres in determining the child's best interest. Ayres, an attorney, has served as the guardian of Alissa's estate since October 15, 1992, and has managed the child's primary asset—the expectancy from a pending malpractice action related to the child's health problems. Ayres was called as a witness by the respondent's counsel. Ayres also submitted a letter regarding his recommendations for the respondent to maintain parental rights.

Ayres testified that he replaced the petitioner as the guardian of the estate because she did not cooperate in the prosecution of the medical malpractice action. Ayres was also asked to comment on the interaction he observed between the respondent and Alissa. In its memorandum of decision, the trial court stated: "Attorney Ayres described a meeting in 1994 in Probate Court while waiting to be heard by the court. [The petitioner] had left and he, Alissa and [the respondent] were waiting. [The respondent's] behavior with Alissa was appropriate, he stated. [The respondent] gave Alissa some paper and she drew a picture for him. He did not see anything out of the ordinary, and he thought that they interacted as mother and daughter. He also wrote a letter . . . on his involvement in [this] matter, his knowledge of the history of the family, and his observations as a human being and father himself. He did not claim any expert status. . . . He did not see the need to eliminate [the respondent] from Alissa's life."

In its discussion of whether termination of parental rights was in the best interest of the child, the court cited Ayres' testimony as supporting the conclusion that while the respondent does not provide the mini-

mum level of parental care, neither is her care nonexistent. This ultimately helped the court conclude that the respondent's parental rights should not be terminated and that a minimal level of visitation should be permitted.

The petitioner claims that Ayres' testimony was improper because he was not qualified to testify as to Alissa's best interest, and that this court should reverse the trial court's decision and remand the case for a new trial. The petitioner primarily relies on *Ireland* v. *Ireland*, 246 Conn. 413, 717 A.2d 676 (1998), for support. We conclude that *Ireland* is distinguishable from this case and affirm the judgment of the trial court.

In *Ireland*, the attorney for the minor child submitted an unsolicited report to the trial court recommending that the child's best interest would be served by preserving the status quo in the case. Id., 435. The *Ireland* court concluded that an attorney for the child should "be heard in a similar manner as most other attorneys are heard, that is, through such methods as written briefs, questioning of witnesses, oral arguments, and other proceedings that take place during the course of a trial." Id., 439.

Relying on the testimony of Ayres is different from the improper intermeddling found in *Ireland*. Ayres was not the attorney for the child in this matter. Rather, he is the guardian of the estate. See General Statutes § 45a-629. His primary task has been to manage Alissa's primary asset, an expectancy from an as yet unresolved medical malpractice lawsuit related to her condition.

Although Ayres primarily manages Alissa's property interests, he is also a fiduciary for Alissa. See Connecticut Probate Practice Book (4th Ed. 1996) rule 5.4, part II, p. 36. The status of fiduciary "means not only to be able to handle money and property competently, but also to understand that a fiduciary must act prudently

and exclusively in the best interest of the [ward] and avoid conflicts of interest." Id., rule 3.6 commentary, part II, pp. 26–27. Unlike an attorney for the child, Ayres is not limited to submitting argument through briefs and questioning of witnesses. Cf. *Ireland* v. *Ireland*, supra, 246 Conn. 438–39. Rather, his concern lies with promoting Alissa's best interests. See *Schult* v. *Schult*, supra, 241 Conn. 779.

This fiduciary nature of the role of guardian of the estate, combined with a dose of common sense, points to the conclusion that the court, in its sound discretion; *Zering* v. *Zering*, 5 Conn. App. 249, 251, 497 A.2d 1023 (1985); properly allowed Ayres' testimony. Ayres merely testified as to his personal observations of the interactions between Alissa and the respondent. See *State* v. *Watson*, 50 Conn. App. 591, 600, 718 A.2d 497, cert. denied, 247 Conn. 939, 723 A.2d 319 (1998), cert. denied, 526 U.S. 1058, 119 S. Ct. 1373, 143 L. Ed. 2d 532 (1999) (lay witnesses may provide testimony regarding observed facts). As the court explicitly stated, he did not claim any expert status, but merely testified on the basis of his personal experience. These observations are certainly valid and relevant to determining whether the respondent may provide some positive influence in Alissa's life as a "visiting resource."[6] Accordingly, we will not disturb the trial court's sound discretion to admit such testimony.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[6] Insofar as Ayres' lay testimony commented on the ultimate issues of fact in the case, it is still permissible where, as here, "the trier, in order to make intelligent findings, needs [such] assistance on the precise question on which it must pass." (Internal quotation marks omitted.) *State* v. *Spigarolo*, 210 Conn. 359, 374, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989); see also C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988 & Sup. 1998) § 7.17.3, p. 186.