[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On July 1999, Isiah D. was born to the respondent, Regina D. The respondent, who is thirty-eight years old, has three other children by three men other than Isiah's father. She has never been married and none of her other children are in her care. The respondent has a lengthy history of alcohol and drug abuse as well as a history of involvement in the criminal justice system.
While she was carrying Isiah, the respondent did not seek prenatal care. Although Isiah was not tested at birth for substance exposure, doctors were concerned about Isiah's irritability and possible fetal alcohol syndrome, as well as an erratic sleep pattern, tremors, eye twitching and tightening of upper extremities, all of which are consistent with prenatal cocaine exposure.
On July 18, 1999, the Department of Children and Families (DCF) invoked a so-called "ninety-six hour hold" on Isiah pursuant to General Statutes § 17a-101g(c), (d). On July 20, 1999, a judge of the superior court issued an ex parte order vesting temporary custody in DCF. On July 28, 1999, the court affirmed that order after a hearing. Since he was taken into custody by DCF, Isiah has lived with the same foster family.
On January 28, 2000, Isiah was adjudicated a neglected child and committed to the custody of DCF. On September 18, 2000, DCF filed this petition to terminate the respondent's parental rights. CT Page 10262
"Termination of parental rights means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents. . . . Termination of parental rights is a most serious and sensitive judicial action. . . . Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to the statutory standards." (Citations omitted; internal quotation marks omitted.) In re Steven N., 57 Conn. App. 629, 632,749 A.2d 678 (2000).
In a proceeding to terminate parental rights without a parent's consent, brought pursuant to General Statutes § 17a-112, those statutory standards require that DCF prove three elements by clear and convincing evidence: (1) that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110
or section 17a-111b that such efforts are not appropriate," (2) that one or more statutory grounds for termination exist, and (3) that termination of parental rights is in the best interests of the child. General Statutes § 17a-112 (c), now § 17a-112 (j).
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . . It is thus possible for a court to find that a statutory ground for termination of parental rights exists but that it is not in the best interests of the child to terminate the parental relationship, although removal from the custody of the parent may be justified." (Citations omitted; internal quotation marks omitted.) Inre Ashley E., 62 Conn. App. 307, 311-12, 771 A.2d 160, cert. denied,256 Conn. 910, 772 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601
(2001).
 I
"It is axiomatic that in seeking to terminate parental rights, the commissioner must prove by clear and convincing evidence that CT Page 10263 the department made reasonable efforts to reunify the parent and child as required by [General Statutes] § 17a-112 (c)(1) [now §17a-12 (j)(1)]. . . . The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citations omitted; internal quotation marks omitted.) In re Daniel C., 63 Conn. App. 339, 360-61, ___ A.2d ___ (2001).
On July 19, 2000, the court, Mack, J., determined that it was no longer appropriate to continue reunification efforts. See General Statutes (Rev. 1999) §§ 17a-110 (b), 46b-129 (k). Prior to that date, DCF had offered the following services to the respondent: supervised visitation; transportation; substance abuse evaluations' at Wheeler Clinic, ADRC (Alcohol and Drug Recovery Centers); case management services; foster care; referrals to inpatient services at Milestones, Blue Ridge, and the Institute of Living (IOL); placement at Coventry House; Guenster Rehabilitation Center; Families in Recovery, in Stamford; Morris Foundation in Waterbury; Crossroads, in New Haven; Women and Children Center, in Middletown; New Life, in Putnam; Elm City Rehab, in New Haven; Mother's Retreat, in Groton.
By clear and convincing evidence, the court finds that DCF used reasonable efforts to reunite the respondent and her son.
 II
DCF seeks to terminate the respondent's parental rights on two grounds. The first ground that the court addresses is DCF's claim that there is no on-going parent-child relationship between the respondent and Isiah.
"General Statutes (Rev. to 1999) § 17a-112 (c)(3)(D), now (j)(3)(D), provides that the court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that `there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . .'
"This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the CT Page 10264 future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent. . . . Feelings for the natural parent connotes feelings of a positive nature only." (Citations omitted; internal quotation marks omitted.) In re Jonathan G., 63 Conn. App. 516, 525, ___ A.2d ___ (2001).
In In re Valerie D., 223 Conn. 492, 613 A.2d 748 (1992), however, our Supreme Court further circumscribed the conditions under which parental rights could be terminated based on "no ongoing parent-child relationship." In Valerie, a child was taken from the mother and placed in foster care within a week of the child's birth. Approximately three and one-half months after the child's birth, DCYS (now DCF) filed a coterminous petition to terminate the mother's parental rights based, inter alia, on the lack of an ongoing parent-child relationship. For over two weeks prior to the filing of the petition, the mother was denied any visitation with her baby until she could produce a note from her physician stating that she was free of communicable diseases. Id., 528. The petitioner's expert testified that there was no parent-child relationship.
The Supreme Court observed that while General Statutes § 46b-129
authorized an order of temporary custody based on a reasonable cause standard of proof, grounds for termination of parental rights must be established by clear and convincing evidence. Under the facts of the case, however, "once the child had been placed in foster care pursuant to the determinations made under § 46b-129, a finding of lack of an ongoing parent-child relationship three and one-half months later was inevitable" under the termination of parental rights statute. Id., 533. The court held that it would not "be consistent to read the two statutes together so as to contemplate such a scenario." Id., 534. Thus, the court concluded, § 46b-129 and the termination of parental rights statute "cannot be read together so as to permit the custody determinations made under the first statute to lead directly to the termination determination under the second statute." Id., 535.
The Appellate Court has recently distinguished In re Valerie where a custodial parent "lapsed into drug use and disappeared for a number of months." In re Shane P., 58 Conn. App. 234, 241, 753 A.2d 409 (2000). In such a circumstance, the court held, it was the parent's conduct rather than the child's being in foster care that resulted in the absence of a parent-child relationship. Id., 241-42. CT Page 10265
Here, however, In re Valerie controls. Isiah was a newborn when he was taken into custody and placed in foster care by DCF. While the respondent may have continued her drug use after Isiah's birth, she visited her son with fairly regular consistency.
DCF points to a positive encounter between the respondent and Isiah that occurred during an interaction study conducted by Dr. Bruce Freedman, Ph.D. when Isiah was four months old.[1] DCF argues that this positive interaction proves that the respondent could have developed a parent-child relationship with her son.
This positive interaction appears episodic in light of other unrefuted evidence. Moreover, there is no question that, whatever the embryonic relationship between Isiah and his mother may have been in 1999, the failure of that relationship to blossom into a parent-child relationship is a consequence of Isiah's being in foster care since he was eight days old. Accordingly, the court may not terminate the respondent's parental rights based on the lack of an ongoing parent-child relationship. See Inre Kelly S., 29 Conn. App. 600, 617, 616 A.2d 1161 (1992).
 III
The remaining ground of the petition alleges that since custody of Isiah was taken by DCF, the respondent has failed to achieve rehabilitation. By clear and convincing evidence, the court finds that this ground has been proven.
"Failure of a parent to achieve sufficient personal rehabilitation is one of six statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. General Statutes [(Rev. to 1999)] § 17a-112 (c)(3)(B) . . . now (j)(3)(B). That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a CT Page 10266 responsible position in [her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) Inre Sheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001). "An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities." Inre Stanley D., 61 Conn. App. 224, 231, 763 A.2d 83 (2000).
"Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re DanielC., supra, 63 Conn. App. 357. However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In re Stanley D., supra, 61 Conn. App. 230.
"The following additional facts are necessary to our resolution of this claim." In re Steven N., supra, 57 Conn. App. 633. Although the respondent has tested in the low average range of intelligence, she is a high school graduate with vocational training and some past clerical work experience. She has, and has admitted to, a seventeen year history of alcohol abuse and a ten year history of cocaine abuse.[2] In the three years prior to Isiah's birth, the respondent had been involved in four substance abuse treatment programs. She showed poor cooperation with these programs. Between Isiah's birth and the filing of the termination petition, the respondent failed to complete any drug rehabilitation programs.
In addition to her substance abuse, the respondent has a schizophrenic disorder with some auditory hallucinations, long history of depression and personality disorder. She did not address, or was unable to address, her psychiatric problems prior to the adjudicatory date. The respondent has a history of physical altercations and domestic violence. Her history of domestic violence has been so pervasive that, in her psychological evaluation with Dr. Bruce Freedman, she complained about being interviewed by a male, since all males in her life had battered her.[3]
She made no progress in controlling her anger prior to the adjudicatory date. Throughout the history of Isiah's involvement with DCF, the respondent has been evasive with important information — including where she was living, the identity of Isiah's father, and where she was working — noncompliant with services and often refusing to sign CT Page 10267 releases or submit to drug evaluations. She has generally presented herself in a guarded and angry manner to professionals who have sought to help her. While her evasiveness and secrecy may be understandable in light of her adverse history with DCF, it nonetheless has subverted her rehabilitation. She did not have stable housing or employment during 1999 or 2000.
When DCF took custody of Isiah, he and the respondent were residing at the Holy Family shelter. The respondent had failed to take proper care of Isiah in the shelter.
Between July and December 1999, the respondent's DCF social worker repeatedly asked her to submit to a substance abuse evaluation. The respondent repeatedly refused until shortly before the filing of the petition. On August 8, 2000, the respondent participated in a substance abuse evaluation at Community Health Services. Prior to the filing of the petition, the respondent had failed to complete any substance abuse treatment or mental health programs. She apparently attended an outpatient program at Blue Ridge. The court, however, cannot gauge her performance at Blue Ridge because she refused DCF's request that she sign a release to enable DCF to obtain that information. The respondent left the Institute of Living after only one day. She also left another program, Hogar-Crea, saying she "couldn't take it anymore." She was not compliant with Services at Hartford Behavioral Health, as testified to by Dr. Pamela Taylor, although she had referred herself to that program.
As observed supra, "[Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child. . . ." (Internal quotation marks omitted.) In reEden F., 250 Conn. 674, 706, 741 A.2d 873, rearg. denied, 251 Conn. 924,742 A.2d 364 (1999). The court, therefore, makes the following additional findings. Despite a number of problems in the first few months of life, enumerated supra, Isiah does not have significant developmental delays. Although he does not have "classic" Fetal Alcohol Syndrome, it is, according to his pediatrician, "too early to assess [him] for any alcohol-related neurodevelopmental disorders, such as ADHD or cognitive difficulties." Isiah may yet develop "alcohol related neurobehavior or alcohol related neuro development disorder, as substantial amount of children exposed to alcohol in utero do." Moreover, Isiah's mental organization and cognitive functioning may yet be affected by his mother's prenatal ingestion of cocaine. On June 4, 2001, Isiah was discharged from the Genetics Clinic of the Children's Center with the "diagnosis of possible alcohol-related neurodevelopmental or neurobehavioral disorder." For this reason, the Children's Center recommended that Isiah's foster family arrange for him to receive services early if any delays are observed. CT Page 10268
Moreover, Isiah is a small child for his age. For this reason, the Children's Center recommended that the Birth to Three Program, in which Isiah's foster parents involved him, contact a nurse of dietician to develop a plan to increase his daily caloric intake to achieve weight gain.
At the time of the filing of the petition, the respondent had wholly failed to address any of her issues — psychiatric, behavioral or substance abuse. Thus, she had failed to take care of herself and was incapable of caring for a child of Isiah's age and needs. Nor was there reason to believe that she would be able to assume a responsible position in his life within a reasonable time.
By clear and convincing evidence, the court finds that the respondent has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering Isiah's age and needs of the child, she could assume a responsible position in his life.
 IV A. Mandatory Findings
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., 62 Conn. App. 307, 315,771 A.2d 160 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev. to 1999) § 17a-112 (d) [now § 17a-112
(k)]." (Footnote omitted; internal quotation marks omitted.) In re DeanaE., 61 Conn. App. 185, 190, 763 A.2d 37 (2000).
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
DCF promptly offered appropriate services to the respondent after taking custody of Isiah, including: supervised visitation; transportation; substance abuse evaluations' at Wheeler Clinic, ADRC [Alcohol and Drug Recovery Centers]; case management services; foster care; referrals to in-patient services at Milestones, Blue Ridge, and CT Page 10269 IOL; placement at Coventry House; Guenster Rehabilitation Center; Families in Recovery, in Stamford; Morris Foundation in Waterbury; Crossroads, in New Haven; Women and Children Center, in Middletown; New Life, in Putnam; Elm City Rehab, in New Haven; Mother's Retreat in Groton. After July 19, 2000, DCF continued to afford the respondent supervised visitation, case management services and foster care.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
As observed supra, DCF made reasonable efforts to reunite mother and son.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
The respondent was ordered by the court, Mack, J., to cooperate with rules of Coventry House. However, that facility determined that it was not an appropriate placement for the respondent.
Accompanying the order of the court served on the respondent vesting temporary custody of Isiah in DCF were unsigned "specific steps", advising the respondent "to comply with the following steps to retain or regain the custody of" her child. Those steps included the following orders: keep your whereabouts known to DCF, participate in parenting and individual counseling, submit to substance abuse assessment and follow recommendations regarding treatment; successfully complete substance abuse treatment including inpatient treatment if necessary; submit to random drug testing; sign releases authorizing DCF to communicate with service providers; secure and maintain adequate housing and income; do not engage in substance abuse.
Although theses steps were not signed, the respondent was made aware by her DCF social worker of what she had to do to regain Isiah. See In reRoshawn R., 51 Conn. App. 44, 58, 720 A.2d 1112 (1998). Specifically, DCF social worker Diane LaGrega informed the respondent that to regain custody of Isiah she would have to participate in substance abuse treatment, address her mental health issues and participate in a parenting program. She did none of these things at the time of the filing of the petition. As discussed infra, she did make some progress thereafter and completed a dual diagnosis program at Stonington Institute. CT Page 10270
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Isiah has no discernible emotional tie to the respondent. He does not recognize her as his mother or as a relative. For most of the two years since he was removed from the respondent's custody, Isiah and the respondent have had a poor visiting relationship. Isiah would react badly when he knew he was going to see and interact with the respondent. Only in the last five months has the respondent attained an acceptable visiting relationship with her son, during which he does not act out.
Conversely, Isiah has developed a deep emotional tie to his foster mother. While he has no name by which he refers to the respondent, he refers to his foster parents as "mommy" and "daddy."
5. Finding regarding the age of the child.
Isiah is two years old.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
The respondent has visited Isiah fairly consistently. However, she has, for much of the past two years, failed to adequately engage Isiah during these visits. At times, she has manifested inadequate parenting skills in these visits.
At the time of the filing of the petition, the respondent had neither addressed her substance abuse issues nor her mental health issues. In August 2000, the respondent submitted to a urine screen which tested positive of cocaine.
The respondent was referred by DCF to ADRC. After the respondent was unsuccessful in remaining sober in ADRC's program, ADRC referred the respondent to Stonington Institute (Stonington), a facility offering dual diagnosis treatment for substance abuse and mental illness. The CT Page 10271 respondent entered Stonington for treatment of her chemical dependence and psychiatric disorders on November 7, 2000. She was placed in Stonington's partial hospitalization program and was eventually placed in a supervised, "managed" home in the community with other women where she did household chores and attended group meetings. After the respondent was at Stonington a little more than four months, Dr. Michael Hayes, Ph.D., Stonington's program director opined that she had "begun to develop the skills involved in thinking things through and connecting behaviors with consequences."
With respect to the substance abuse treatment aspect of her program at Stonington, the respondent did maintain sobriety from November 7, 2000 through her discharge on May 15, 2001. However, as Dr. Hayes stated in his discharge summary, on more than one occasion, the respondent "was addressed about something she had done or had said and she tended to deny whatever it was even though there had been observers to her behavior. The patient was never able to utilize the recovery community to its fullest extent."
With respect to the psychiatric or emotional aspect of her treatment, Dr. Hayes wrote that the respondent "tended to participate in therapy in a guarded or agitated manner and would often times appear to be disinterested in groups. She managed her feelings, but had difficulty being a part of the community"
"At the time of her discharge," Dr. Hayes wrote, "the [respondent] was clean and sober. She had been attending meetings nightly and she did have a sponsor. Her emotional stability had improved and she completed many of the personal goals she set for herself, but she was often volatile and had a street attitude, especially when she did not get her own way. Her progress is positive, but guarded." In his testimony, Dr. Hayes defined a "street attitude" as an aggressiveness with an "edge to it." He also conceded that the respondent had difficulty following rules in the managed home, such as not smoking and when to use the telephone and when to do chores.
The respondent's diagnosis at discharge was alcohol and cocaine dependence, both in early full remission; schizophrenic disorder, which was being treated with medication; problems with primary support groups, social environment, and joblessness.
The court finds that the respondent has not used alcohol or illicit drugs between the time she entered Stonington and the time of trial. Since April 2001, she has been living in the community, although between April and May 17, 2001, she was in a managed setting. As Dr. Hayes testified, if the respondent complies with her aftercare CT Page 10272 recommendations, as she has since May 17, 2001, her prognosis is good. The respondent has now obtained adequate housing, an apartment in a good area of New London. She is taking the medication prescribed for her psychiatric disorders and receives counseling. She is seeking employment. One month ago, she provided DCF with signed releases to monitor her therapy and counseling.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
There were isolated instances over the past two years when DCF had to cancel a scheduled visit between Isiah and his mother. However, the court finds that the respondent has not been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent, or the unreasonable act of any other person or by her economic circumstances.
 B.
Although in determining whether to grant a petition to terminate parental rights the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now § 17a-112
(k); In re Tyscheicka H., 61 Conn. App. 19, 26, 762 A.2d 916 (2000); "[t]he trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203,208, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791
(2000). Notably, General Statutes (Rev. 1999) § 17a-112 (i), now § 17a-112 (p), expressly provides that its provisions "shall be liberally construed in the best interests of any child for whom a petition under this section has been filed." "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re Shyina B., 58 Conn. App. 159, 167,752 A.2d 1139 (2000).
"[A]lthough the respondent demonstrated some efforts and had taken some steps toward rehabilitation, those efforts were too little and too late."In re Sheila J., supra, 62 Conn. App. 481. While the respondent has now finally addressed her substance abuse and mental health problems, until two months before trial she maintained her sobriety in a structured and CT Page 10273 supervised setting. Only since then — in the last few weeks — has she been living independently. Whether the respondent will be able to maintain her sobriety in the community, over the long term, is a matter of speculation.
Moreover, in her dealings with DCF, service providers and the Stonington staff, the respondent has manifested a considerable difficulty in consistently getting along with other people. She appears never to have had a constructive and trusting relationship. It is difficult to conceive of such a person parenting a young child. The ability to achieve a constructive and trusting relationship with professionals and other adults in a child's life and with the parents of a child's peers is a requirement for good parenting. In addition, the respondent, who is the product of a home fraught with domestic violence, has not addressed her own propensity toward domestic violence. This raises the very real concern that any relationship she may have with a male will be a destructive one.
Finally, Isiah has, overall, not enjoyed a good visiting relationship with his mother. As observed supra, he does not recognize her as his mother or even as a relative.
Isiah is a healthy two year old. He lives with a good foster family. His foster mother cares for him very much, and she is clearly his psychological parent. His foster parents are willing to adopt him. By clear and convincing evidence, the court finds that Isiah's "interests in sustained growth, development, well-being, and continuity and stability of its environment" will best be served by the termination of the respondent's parental rights and his permanent placement, that is, his adoption, by his foster parents. By clear and convincing evidence, the court finds that it is in Isiah's best interests that his mother's parental rights be terminated.
 V
DCF also seeks to terminate the parental rights of Isiah's father on the basis that he has abandoned Isiah and has no ongoing parent-child relationship with him. At one point, the respondent named a Charles C. as Isiah's biological father. Mr. C., however, took a paternity test which established that he was not the father. Since that time, the respondent has consistently refused to disclose the true identity of Isiah's father. Nor is there any other way to divine his identity. He has not significantly, if at all, surfaced in Isiah's life. For these reasons, the father has been given only a generalized notice by publication.
The court finds by clear and convincing evidence that reasonable CT Page 10274 efforts by DCF to "reunite" father and son have not been possible.
For the reasons discussed in part II, the court finds that the claim of no ongoing parent-child relationship is inapposite and is dismissed.
"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [§] 17a-112 (b)(1) . . . defines abandonment as the fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare . . .
"Section 17a-112 (b)(1) does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." . . .
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted.) In re Deana E., supra, 61 Conn. App. 193.
By clear and convincing evidence, the court finds that the father has abandoned Isiah and that it is in Isiah's best interests that the father's parental rights be terminated.[4]
 VI
The petition is granted as to both respondents. The court terminates the respondents' parental rights. Isiah's foster parents shall be afforded the first opportunity to adopt him. It is further ordered that the Commissioner of the Department of Children and Families is appointed statutory parent for [the child] for the purpose of securing a permanent adoptive family. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts CT Page 10275 to effect such permanent placement and file further reports as are required by state and federal law.
Dated at Middletown this 30th day of July, 2001.
BY THE COURT
Bruce L. Levin Judge of the Superior Court