[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On December 4, 2000, the commissioner of the Department of Children and Families filed a petition to terminate the parental rights of the parents of Amber S., a child now 6 1/2 years old. The case was originally tried to the court on January 22, 23 and 24, 2002. After the parties had rested, argued and submitted post trial briefs, the respondents filed motions to open the evidence based on a change in Amber's condition. The change was that she had disrupted from the home in which she had been residing for 2 1/2 years and had been admitted to Riverview Hospital for a psychiatric evaluation. At the hearing on the motions to open the evidence, the respondents argued that the court should address the adjudicatory phase[1] of the case and continue the matter for additional expert evidence of what was in Amber's best interests in light of the new developments. The court agreed, granted the motions and issued a memorandum of decision on June 4, 2002. In that decision the court found that DCF had made reasonable efforts to reunite father and daughter. The court also found that it need not make a reasonable efforts finding with respect to the mother because on August 2, 1999, the court (Schuman, J.) had found that continued efforts by DCF to reunify mother and daughter were not appropriate. See General Statutes §17a-112 (j)(1). Finally, the court found that Amber had previously been adjudicated neglected and that the respondents "had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent[s] could assume a responsible position in the life of the child. . . ." General Statutes § 17a-112 (j)(3)(B).
On August 27, 2002, the court heard additional evidence as to whether termination of the respondents' parental rights would be in Amber's best interests. The court also heard the parties in closing argument.
The court finds the following facts. After the close of the evidence before this court on January 24, 2002, Amber disrupted from her placement with Karen and Donna S. because of her behavioral difficulties, on the one hand, and Karen's health problems and Donna's emotional limitations, CT Page 11344 on the other. They are no longer a placement option.
Karen and Donna took Amber to Connecticut Medical Center. From there she was sent to the children's unit at Natchaug Hospital. She was there for about two weeks. She then went to a Klingberg Safe Home briefly. DCF then placed her with the Rodriguez family. They were unprepared for a child with Amber's issues, especially her attachment problems. Amber disrupted from that placement in two months. She was then placed with her current foster therapeutic home where her foster mother has, for the past six weeks, been dealing successfully with Amber's issues. Except for one call the mother made when Amber was taken to Natchaug Hospital, neither parent has made any inquiries about Amber's condition since January 2002. Amber now states that she no longer wishes to see her father.
The court now addresses the dispositional phase of the case.
 I
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of . . . parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., 62 Conn. App. 307, 315, 771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev, to 1999) § 17a-112 (d) [now § 17a-112 (k)]]." (Footnote omitted.) In reDeana E., 61 Conn. App. 185, 190, 763 A.2d 37 (2000).
 Mandatory Findings
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., 62 Conn. App. 307, 315,771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev, to 1999) § 17a-112 (d) [now § 17a-112 (k)]." (Footnote omitted; internal quotation marks omitted.) In re Deana E.,61 Conn. App. 185, 190, 763 A.2d 37 (2000).
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by aCT Page 11345child-placing agency to facilitate the reunion of the child with theparent.
In the late 1990's, DCF timely made available, to both the respondents and Amber, services to facilitate reunification. As to the mother, DCF had offered the mother a VNA parent aide, weekly visitation with Amber, therapy at Counseling Center of Bristol Hospital, and individual counseling for domestic violence at the Bristol intervention office of the Prudence Crandall Center for Women, and substance abuse counseling. DCF also provided Amber with foster care and case management services. In the latter half of 1997, the mother relocated to Vermont. In her testimony, the mother admitted that before she left Connecticut, DCF had offered her services to help her keep Amber and, later, to assist her in regaining custody.
On August 30, 1999, DCF referred the father to Advanced Behavioral Health's Project Safe for a substance abuse evaluation. In 1999, he was twice referred to the Wheeler Clinic for family counseling services with Amber's therapist. In September 1999, the father was referred to Casey Family Reunification Services. In December 2000, DCF referred the father to the DOVE Program at the Wheeler Clinic for domestic violence. The father received supervised visitation at Thomaston Counseling Associates as well as unsupervised visits.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
Until the mother relocated to Vermont in 1997, DCF made reasonable efforts to reunite mother and child. Between June 1997 and August 2, 1999, reasonable efforts to reunite mother and daughter were not possible. On August 2, 1999, the court (Schuman, J.) found that continued efforts by DCF to reunify mother and daughter were not appropriate.
The court finds by clear and convincing evidence that DCF made reasonable efforts to reunite Amber with her father.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
On May 10, 1996, the court issued an order enumerating expectation as to the mother. However, the terms of that court order were not introduced. In any event, the mother relocated to Vermont in 1997. CT Page 11346
Although no party introduced a court order, or expectations, with respect to the father, the social study reflects that on October 19, 1999, such an order was issued, containing the following expectations:
 a. Keep all appointments set by or with DCF. Cooperate with DCF home visits, announced or unannounced, and visits by the child's court-appointed attorney and/or guardian ad litem. Allow DCF to observe visits and follow recommendations re: interactions.
The father complied with this expectation.
b. Participate in counseling.
Because the father withdrew from Casey Family Services' initial assessment and, when again referred, was rejected, and because he was unsatisfactorily discharged twice from the DOVE Program, the court finds that the father failed to participate in individual counseling. He did complete ten out of a recommended twelve weeks of family counseling at Thomaston Counseling Center.
 c. Accept and cooperate with in-home support services referred by DCF and make progress toward the identified goals.
Because the father at first withdrew from Casey Family Services' program and then, when re-referred, was not accepted into the program because he had not engaged in substance abuse evaluation and treatment, the court finds that the father failed to satisfy this requirement.
 d. Submit to random drug testing, the time and method of which to be at the discretion of DCF or the service provider.
In 1999, the father twice refused random urine screens. In August 1999, he relapsed. Thereafter, he continued to refuse drug testing until September 11, 2000. At that time the father submitted to a urine screen and hair test, both of which were negative.
 e. Follow recommendations of service providers, specifically the DOVE Program of Wheeler Clinic, Family Counseling, Dr. Spielman and Casey Family Services.
CT Page 11347
The father failed to complete the DOVE Program. He did not follow the recommendation of Casey Family Services to obtain substance abuse treatment and therefore was rejected by their intensive family reunification program.
In February 2000, Dr. Rose Spielman recommended that the father establish treatment goals for individual counseling. The father, however, felt that he did not need counseling and could not identify any treatment goals. Dr. Spielman, therefore, concluded that there would be no benefit in her working with him.
Thomaston Counseling Center recommended that the father attend individual counseling. The father never followed through on this recommendation. He was, however, fairly consistent in visiting with Amber.
 f. Sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation, and progress toward identified treatment goals, and for use in future proceedings before the court, after being reviewed by your attorney.
The father has refused to authorize DCF to communicate with his probation officer. Dr. Berkowitz, however, did speak with the probation officer, whose verbal report was not encouraging. (See page 50 of court's June 4, 2002 memorandum of decision). The father has signed all other releases requested by DCF.
g. Secure and maintain adequate housing, apart from [paternalgrandmother]
The father's housing has not been stable. He was incarcerated at the time of Amber's commitment to DCF. After his release from state custody he lived with his mother from June 1, 1998 to February 2, 2000. For a time thereafter, he lived with Melissa Morrissey in her parents' home. More recently he and Morrissey obtained their own apartment. In 2002, however, the relationship between the father and Morrissey has become somewhat unstable.
h. No substance abuse.
The father relapsed in August 1999. On September 11, 2000, the father submitted to a urine screen and hair test, both of which were negative. However, in January 2001 he again drank to excess and he and Morrissey became embroiled in an argument to which police were dispatched. CT Page 11348
i. No further involvement with the criminal justice system
In October 1999, the father's then-girlfriend, Ariel George, obtained a restraining order against him because he had been violent with her. In January 2001, police were dispatched to the father's home because of an argument he had with Morrissey.
 j. Cooperate with the Office of Adult probation or parole officer and comply with the conditions of probation or parole.
As of January 29, 2001, the father's probation officer determined that he was in "violation status." (Ex. 28) The reason for this is unclear but apparently was because he had either failed to report for an appointment with his probation officer or had failed to complete a mental health evaluation. As of the time of trial, however, the father had not violated the terms of his probation although, according to his probation officer, he pushed the limits of his probation officer's patience. (Ex. 14)
The father's conditions of probation required him to remain drug and alcohol free. He relapsed twice, in August 1999 and January 2001.
 k. Visit the child as permitted pursuant to the court order; allow DCF to randomly monitor phone contact.
The father has consistently visited Amber as much as his work schedule permitted. There was no evidence that DCF monitored the father's telephone calls to Amber.
 1. Immediately advise DCF of any changes in the composition of the household to ensure that the change does not compromise the health and safety of the child.
DCF has failed to prove that the father did not comply with this requirement, although he often refused to disclose to DCF the names of girlfriends to whom he brought Amber or with whom she had contact.
Although the court's order contained other steps, these were inapplicable because Amber has not resided with the father since the date of her commitment.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andCT Page 11349any person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
In her observation of the parent-child interaction between Amber and her mother in May 2001, Dr. Berkowitz observed "some recognition and some mild signs of attachment" by Amber. Amber, however, does not love her mother nor does she have a significant emotional bond to her.
Prior to 2002, the evidence was that Amber loved her father and there was a significant emotional bond between them. More recently, however, Amber's perceptions of abuse by the father have surfaced and she no longer wishes to visit with her father.
Amber's current therapeutic foster family appears to be managing her behaviors well. She has, however, resided with them for only six weeks and it is far too soon to make any findings as to an emotional bond between them and this child who suffers from Reactive Attachment Disorder (RAD).
5. Finding regarding the age of the child.
Amber is now 6 1/2 years old.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
Prior to February 2001, the mother had made no progress whatsoever in adjusting her circumstances to make it in the best interest of Amber to return to her. She was still an active alcoholic, led a nomadic existence, had not been employed in a responsible position for a significant period of time, was generally irresponsible and did not visit Amber. Since February 2001, when she entered Families in Recovery (FIR), she has made substantial progress in putting her alcohol dependency in remission and, with the aid of prescribed medications, some of which she no longer needs, controlling the symptoms of her post traumatic stress disorder and other psychological conditions. However, she and Amber remain little more than relatives who were comfortable when they saw each CT Page 11350 other briefly in 2001 after years of separation. The mother has had a very protracted stay at FIR, longer than is generally prescribed by that facility. She has been sober for two years, a very commendable accomplishment but one which, as Dr. Berkowitz remarked, raises concerns as to how she would deal with relapse. The mother is about to begin independent living with her infant daughter Jasmine. How well she will continue to function without the structure of FIR is speculative. Nonetheless, she must be commended for turning around her life and becoming a good mother to Jasmine.
The father has also made adjustments in his circumstances, conduct or conditions. He has had no further involvement with the criminal justice system and is focused on his career as a trucker. He visited Amber when he could, although visitation was inconsistent because of his commitment to his vocation. However, he has been resistant to most of the services to which he has been referred and is perceived by a number of professionals with whom he has had contact as insincere, manipulative and self-centered. He is very much in need of individual counseling. Although his manipulative nature and self-centeredness belie an immaturity, he too must be commended for extricating himself from the criminal culture that landed him in jail in 1995 and leading a vocationally productive life.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
The father's economic circumstances required that he work in the trade with which he is most employable, an interstate truck driver. This did hamper his ability to pursue counseling and, on a some occasions, prevented him from visiting or telephoning Amber. He was, however, never committed to pursuing counseling. The father also suggests that DCF impeded his relationship with his daughter by crediting the claims of Karen and Donna S. that Amber feared him. He achieved, however, the only meaningful relationship with Amber that he acknowledges is appropriate, a visiting relationship.
The court finds that the respondents have not been prevented from maintaining a meaningful relationship with Amber by the unreasonable act or conduct of either of them, or the unreasonable act of any other person or by their economic circumstances.
 II
CT Page 11351
Although, when determining whether to grant a petition to terminate parental rights, the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now §17a-112 (k); In re Tyscheicka H., 61 Conn. App. 19, 26, 762 A.2d 916
(2000); "[t]he seven factors . . . serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered." In re Quanitra M., 60 Conn. App. 96, 104,758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). "The trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208,742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). What is clear, however, is that the focus must be on what is best for the child, not on what is best for the parent. Cf. In re Bruce R.,234 Conn. 194, 206, 662 A.2d 107 (1995). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re Shyina B., 58 Conn. App. 159, 167,752 A.2d 1139 (2000). "In addition, the genetic bond shared by a biological parent and . . . her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider. . . ." (Internal quotation marks omitted.) In re Savanna M.,55 Conn. App. 807, 816, 740 A.2d 484 (1999).
Amber is now in her seventh placement. She disrupted from her placement of 2 1/2 years with Karen and Donna S. earlier this year, resulting in her being briefly institutionalized. While Dr. Barbara Berkowitz characterized her RAD as "mild," her behaviors have been severe enough to undermined her placement with Karen and Donna and to contribute to the failure of her placement with another aunt in Vermont. She is now in a therapeutic foster home and very much in need of stability. Her new foster parents are committed to providing her with long-term foster care but, unremarkably, at this early date, cannot commit to adopting her. However, Dr. Berkowitz, an adoption specialist, opined, and this court finds, that Amber is indeed an adoptable child.
As discussed in the court's June 4, 2002 memorandum of decision, neither parent is a placement resource nor will they be for the foreseeable future. The mother, who resides in Vermont, has made great strides in her own life, but her sobriety remains tenuous. Moreover, she must care for her infant child, Jasmine, and visits another child in Connecticut periodically. She has virtually no relationship with Amber. While it is possible that controlled contact with the mother may one day CT Page 11352 be therapeutically indicated, at this time such visitation could be destabilizing to Amber. This would be especially so if Amber, a RAD child who craves attention, had to contend with Jasmine for her mother's attention. In any event, that contact with the mother might be beneficial to Amber in the future is no reason to delay providing her with stability, if not permanency, now.
Amber no longer wishes to see her father and, moreover, his ability to visit her is compromised by his vocation. In his conversation with Dr. Berkowitz, the father did not name himself as a visiting resource. Rather, he again urged that Amber be placed with his parents. The paternal grandparents, however, have never appeared in court nor have they moved that the guardianship of Amber be transferred to them.
In closing argument on August 27, 2002, counsel for the father articulately urged that the father's parental rights not be terminated so that, in light of the many placements through which Amber has suffered because of mistakes made by DCF, the father could remain an advocate for Amber's best interests. The court finds this argument unpersuasive. First, while it is true that Amber has suffered through too many unsuccessful placements, three of these placements were, consecutively, with relatives, and one was with the father's parents as urged by the father. The law tends to favor relative placements. See., e.g, General Statutes §§ 17a-111a (b), 17a-114 (b); Regulations of Conn. State Agencies §§ 17a-114-16, 17b-4(a)-1(8); In re Ellena D., Superior Court, judicial district of New Haven (February 23, 1996) (Brenneman,J.); In re Anthony N., Superior Court, Juvenile Matters, judicial district of Hartford/New Britain at Hartford (April 15, 1994) (Mulcahy,J.) ("Normally, the court would consider a placement with a blood relative as preferable."). While it may be, in hindsight, that Amber may have been better off if left with the paternal grandparents in June 1998, she was nonetheless placed with another relative at that time. Second, to the extent that Amber requires an advocate, that advocate ought not to be the father. As the evidence, including Dr. Berkowitz' reports, indicate, despite his achievements he remains more likely than not to advocate for his own interests, rather than what is best for Amber.
In reaching its decision on disposition, the court has given much weight to the report and testimony of Dr. Barbara Berkowitz.
By clear and convincing evidence, the court finds that it is in Amber's best interests that the respondents' parental rights be terminated.
The petition is granted. The court terminates the respondents' parental CT Page 11353 rights. The commissioner of the Department of Children and Families is appointed statutory parent. Because of Amber's RAD, should DCF retain a new or additional therapist for Amber in the future, it will endeavor to commit the therapist to a long-term, uninterrupted professional relationship. The commissioner shall file with this court no later than 30 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
BY THE COURT
Bruce L. Levin Judge of the Superior Court