[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The commissioner of the Department of Children and Families (DCF) has petitioned to terminate parental rights with respect to Alexander T. and Elijah T.
Alexander and Elijah were born to Denise T. (the mother) on October 1994 and January 1996, respectively. Alexander's father is Leonard T. (Sr.). Elijah's father is José R.
On January 12, 1999, the mother, who had a prior history with DCF, was arrested in a drug raid of her adult daughter's apartment, where the mother was residing. Alexander and Elijah, who were with the mother at the time, were taken into custody by DCF. DCF obtained an order of temporary custody of the children and filed a petition alleging that they were neglected and uncared for. On October 15, 1999, the children were adjudicated neglected and uncared for and committed to the custody of the commissioner of DCF. The commitments have been repeatedly extended.
On January 29, 2001, DCF filed petitions to terminate parental rights. The petition was tried to the court over the course of four days.[1]
Our General Statutes "[define] the termination of parental rights as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his or her parent. It is, accordingly, a most serious and sensitive judicial action. . . . Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. . . . The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital CT Page 11903 interest in preventing the irretrievable destruction of their family life. . . .
"It bears emphasis that a judicial termination of parental rights may not be premised on a determination that it would be in the child's best interests to terminate the parent's rights in order to substitute another, more suitable set of adoptive parents. Our statutes and caselaw make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence. . . . [A] parent cannot be displaced because `someone else could do a better job of raising the child. . . ." (Citations omitted; internal quotation marks omitted.) In re Baby Girl B.,224 Conn. 263, 279-80, 618 A.2d 1 (1992).
 I
"To terminate parental rights under § 17a-112 (c), now (j), the department is required to prove by clear and convincing evidence that it has made reasonable efforts to reunify the children with the parent unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. In accordance with § 17a-112 (c)(1), the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate. . . .
"Turning to the statutory scheme encompassing the termination of parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Citations omitted; internal quotation marks omitted.) In re Ebony H., 68 Conn. App. 342, 348-49,789 A.2d 1158 (2002).
Since there has not been a previous judicial determination that the use CT Page 11904 of reasonable efforts was not appropriate, DCF must establish by clear and convincing evidence that it used such efforts or that the respondents were unable or unwilling to benefit from reunification efforts.
The mother has been involved with DC? since 1978. Since 1992, there have been ten reports to DCF that the mother neglected her children. Six were substantiated. At the time it filed this termination petition, DCF knew that the mother had a history of drug use; medical neglect of her older son, Leonard;[2] homelessness and failure to cooperate with DCF and with services to which she was referred.
In July 1995, DCF referred the mother to Lifeline Wheeler Clinic for drug evaluation and drug screening. She did not attend. In December 1995, DCF referred the mother and Leonard to a parent-child evaluation. The mother participated in the first part of this evaluation, but did not participate in the second part. In September, 1996, DCF referred the mother to individual therapy at the Village for Children and Families. The mother missed all appointments. On April 5, 1999, DCF referred the mother to Catholic Charities and Family Services for a drug screen and evaluation. The mother refused to attend. On June 2, 1999, DCF referred the mother to Catholic Family Services for counseling services. Again, the mother failed to attend.
In the first half of 2000, DCF referred the mother to Alcohol Drug Recovery Centers, Inc. (ADRC) for drug screening and evaluation. On October 18, 2000, DCF referred the mother to Community Mental Health Affiliates for a hair analysis. Also in 2000, DCF again referred the mother to an anger management group at the Wheeler Clinic. In 2001, DCF again referred the mother to the Wheeler Clinic for drug screening and evaluation. DCF also provided the mother with case management and provided the children with foster care and counseling. With the exception of a drug screen and evaluation, to which she submitted on August 6, 1999, and visiting her sporadically in 2000 and more consistently in 2001, the mother did not cooperate with any of these services. Moreover, she failed to provide DCF with releases to obtain information and at times failed to disclose where she was living.
The mother argues that DCF failed to use reasonable efforts to reunify the family because it failed to refer her to psychiatric counseling. DCF and the attorney for the children argue that DCF did use reasonable efforts but that the mother was unwilling to benefit from reunification services.
In his October 4, 2000 report, Dr. Rogers opined that the mother suffered from a paranoid personality disorder and recommended that she CT Page 11905 undergo a psychiatric evaluation. The disorder is in large part at the root of the mother's problems. The treatment for such a disorder is counseling. However, the disorder itself renders the patient resistant to counseling.[3]
Based on her track record of over the five years preceding Dr. Rogers' report, it is abundantly clear that even if DCF had referred the mother for a psychiatric evaluation, she would have failed to follow through with any recommended counseling if, indeed, she had attended the evaluation. Her history of recalcitrance is remarkable. DCF referred the mother to individual therapy at the Village for Children and Families in September 1996 and referred her to counseling services at Catholic Family Services in June 1999. Moreover, in speaking with Dr. Rogers on September 21, 2000, the mother asserted that she had been involved in individual psychotherapy since March 2000 and, in fact, considered that therapy "somewhat helpful." (Exhibit U, pp. 3, 26-27.) Consistent with her Paranoid Personality Disorder, she refused to disclose any more about this until her testimony at trial, at which time she claimed the psychotherapist, a person named "Joy," was no longer associated with "Grace Resources," the agency that had employed her. The mother was unaware of the therapist's whereabouts. It is, of course, possible, that had DCF referred the mother to a psychiatrist for an evaluation that she would have admitted that she really was not seeing a psychotherapist, attended the psychiatric evaluation and dutifully followed through on any recommendations the psychiatrist made to her for treatment. Possible but very unlikely. Such possibilities, moreover, do not negate the proposition that DCF used reasonable efforts. The court finds that DCF did not act unreasonably in not referring the mother for a psychiatric evaluation.
The mother also claims that DCF failed to use reasonable efforts to reunify the family because it did not arrange for family therapy between the mother and her sons, Alexander and Elijah. The court disagrees. First, Elijah's therapist opined that because of Elijah's acting out before and after visits with his mother and because of the mother's failure to address her own issues, family therapy was not in Elijah's best interests. While Nadine Green of Klingberg Family Center, who observed the mother's supervised visits, may have suggested otherwise, DCF was not bound to reject the recommendation of the children's therapist in favor of Green, a lay person with little field experience. Second, the absence of family therapy, causally, was not the reason reunification failed. Cf. In re Ebony H., supra, 68 Conn. App. 350
(noting that while DCF's failure to assist the respondent in obtaining housing was "shameful and unacceptable," that failure did not require the court to find that DCF had failed to use reasonable efforts where it was CT Page 11906 respondent's drug addiction and failure to attend counseling that thwarted reunification). The purpose of family therapy, as the evidence reflects, is to address issues between members of the family, inter se. See also Gilman v. Gilman, Superior Court, judicial district of New Haven, Docket No. 385930 (December 9, 1997, Stevens, J.); In re ThomasC., 44 Conn. Sup. 437, 441, 691 A.2d 1140 (1996); Benison v. Benison, Superior Court, judicial district of Hartford/New Britain at West Hartford, Docket No. 043973 (June 30, 1992, Steinberg, J.). Reunification was unsuccessful here because of the failure or inability of the mother to address, in the first instance, her own issues arising out of her Paranoid Personality Disorder.
The mother also suggests that DCF failed to use reasonable efforts to reunify the family because it placed Alexander and Elijah with her sister, Judith, who physically abused the boys.
Although the children were placed with Judith at least in part at the mother's behest, DCF should not have acceded to that request because it knew or should have known that Judith had abused Leonard when he had been placed with her in the past. The abuse visited on Alexander and Elijah by Judith exacerbated the children's anxiety and contributed to their Post Traumatic Stress Disorder (PTSD). However, though DCF made a mistake in placing the children with Judith, that mistake does not necessarily require a finding that DCF failed to use reasonable efforts to reunite the mother with her sons. Cf. In re Charles A., 55 Conn. App. 293, 297,738 A.2d 222 (1999) ("These mistakes, however, do not defeat the proposition that reasonable efforts at reunification were made."). Again, the overarching reason for the failure of reunifidation is not the children's condition but the mother's shortcomings, in short, her inability to address her psychological condition and the sequelae therefrom. Moreover, while the abuse suffered by the children in Judith's home exacerbated their PTSD it did not create that disorder. The primary cause of the disorder was their experience in their mother's custody and their traumatic removal from her in a drug raid. Other steps taken or attempted by DCF clearly show that the agency endeavored to reunify mother and sons.
Neither of the respondent fathers has appeared. The court finds by clear and convincing evidence that DCF used reasonable efforts to locate them and that the fathers are unable or unwilling to benefit from efforts to reunify them with their respective sons.
The court further finds by clear and convincing evidence that DCF used reasonable efforts to reunify the mother with her sons but that the mother was unwilling or unable to benefit from such efforts. CT Page 11907
 II
DCF seeks to terminate the mother's parental rights because she has not rehabilitated. The court finds the following facts.
The mother was born on April 14, 1959. She had an unremarkable childhood and graduated from high school. Thereafter, she floundered and never held a steady job. On September 28, 1987, she gave birth to a son, Leonard.[4]
The respondent has been involved with DCF since 1978. As observed supra, since May 1992, there have been ten allegations of neglect, six of which have been substantiated. In May, 1995, medical neglect of Leonard, who was suffering from ringworm, was substantiated and Leonard was removed from the home. He was returned on June 26, 1996. At that time the court issued expectations to the respondent ordering her to, inter alia, engage in family counseling, to secure and maintain adequate "clean" housing, to have no involvement with the criminal justice system and to cooperate with DCF.
Two months later, Alexander, Elijah and Leonard were adjudicated neglected. The court ordered protective supervision and issued expectations to the mother directing her, inter alia, to participate in family counseling, not to engage in substance abuse and to have no involvement with the criminal justice system.
On July 28, 1997, the mother, who had previously left her children with caretakers, was found to be homeless. DCF filed petitions alleging that both mother and children were homeless and that the respondent was unable to care for her sons. The children were adjudicated neglected in February, 1998, and the court issued another order of protective supervision. The court again issued expectations directing the mother, inter alia, not to engage in substance abuse, to have no involvement with the criminal justice system and to sign releases for DCF.
Shortly thereafter, the respondent was evicted from her dwelling and the family moved out of state. They returned ten months later.
Three weeks after her return, the respondent had not yet enrolled her children in school. On January 20, 1999, while the respondent and her sons were residing with the respondent's older daughter, police conducted a drug raid on that home. The respondent was arrested on an outstanding warrant for failure to appear and for three counts of risk of injury to a minor.[5] The respondent was in jail for two weeks, during which time CT Page 11908 her sons were removed to foster care. On January 22, 1999, DCF filed a petition alleging that Elijah and Alexander were neglected and uncared for. That same day, the court issued expectations to the respondent for a third time, ordering, inter alia, that she participate in individual and parenting counseling, submit to substance abuse assessment and follow recommendations regarding treatment, successfully complete substance abuse treatment, sign releases authorizing DCF to communicate with services providers, and have no further involvement with the criminal justice system.
In March 1999, the boys were placed with a maternal cousin. On April 19, 1999, the respondent was arrested for assault. In July 1999, the children were placed with the respondent's sister, Judith T. The respondent failed to visit her children for nine months.
On August 6, 1999, the respondent tested positive for cannabis.
On October 15, 1999, the court adjudicated Elijah and Alexander neglected and uncared for and committed them to the custody of DCF. The court again issued expectations to the respondent, ordering her, inter alia, to keep all appointments with DCF, to participate in family counseling, to submit to random drug testing and substance abuse treatment, if recommended, to sign releases authorizing DCF to communicate with service providers, to abstain from substance abuse and have no further involvement with the criminal justice system.
With the exception of a drug screen and evaluation to which she submitted on August 6, 1999, the mother failed to cooperate with any of the services to which DCF referred her. That drug screen was positive for cannabis. In late 2001, she refused to give a new DCF social worker her new telephone number. She also failed to provide DCF with releases to obtain information from service providers.[6]
Her visitations with Alexander and Elijah were inconsistent throughout much of 2000. The consistency of the visits improved in 2001. When visits occurred at DCF's offices, the respondent spent much of the time arguing with the DCF social worker, occasionally cursing him. When visits were moved to the Klingberg Family Center, the respondent would confront the social worker in her sons' presence when the worker arrived to return the boys to the foster home.
In 2000, the mother began living with Edgardo F. He is currently on probation for reckless burning and threatening. The mother now has an infant by Edgardo. CT Page 11909
From April, 2001, to September, 2001, the mother failed to keep DCF informed of her whereabouts. In mid-2001, she was convicted and incarcerated at the York Correctional Institution for two counts of failure to appear in the second degree and assault in the third degree, for which she had been arrested in 1999. While she was in prison, the mother did not participate in any addiction services. She is currently on probation.
The court heard the testimony or received reports from several expert witnesses. Mr. Stuart Battle holds the degree of Master of Social Work (MSW), as well as a law degree. He has had extensive experience working with families victimized by drug abuse and with traumatized children. In 1997 he founded the Village for Children and Vamilies (VCF). Battle provided therapy to Alexander for thirteen months as of the time of trial. Mr. Battle testified that Alexander was oppositionally defiant, both at the foster home and at school, and had difficulty staying focused. These behaviors, however, improved when Alexander's visits with the respondent were terminated in 2001. According to Battle, Alexander was parentified[7] when he lived with the respondent and does not like to be touched. Battle ascribed this behavior to Alexander's being inappropriately touched in the past. He also hoards foods and is compulsive about different foods not touching each other.
According to Battle, Alexander does not want to return to the respondent's care, but is very secretive as to why he feels this way. Alexander enjoys the respondent's visits with him but resents Edgardo's presence at those visits. His bond with the respondent is an unhealthy bond, involving what Battle characterized as protecting family business. Alexander has told Battle that he is afraid of his mother. In March, 2001, a VCF worker recommended a decrease in the frequency of visits between the respondent and her sons. Battle opined that Alexander's psychological parent was his foster mother, to whom he is bonded. Although he only met the respondent once, in the courthouse, Battle also opined that the respondent was in denial about her sons' special needs. In Battle's opinion, the respondent is unable to parent Alexander. He recommended that the respondent not be afforded visits with her sons and that it would be in the best interests of the children if the respondent's parental rights were terminated.
Denise Stone holds a Masters degree in psychology and worked at VCF with Alexander since April, 2000, and with Elijah since November, 2000. She testified that Elijah suffered from Post Traumatic Stress Disorder (PTSD) and had a "rule out"[8] diagnosis of sexual abuse. She was uncertain, however, if Elijah's condition derived from abuse in the respondent's home or in a foster home. According to Stone, Elijah was CT Page 11910 traumatized by the way in which he was removed from his mother's care during the drug raid and suffered further trauma in an earlier foster placement. Elijah is unresponsive and becomes anxious when asked if he was harmed when he was in the respondent's care. The significance of this, she stated, was that Elijah has something to say and is afraid to say it.
Elijah has had behavioral problems during the time Stone worked with him. In 2001, however, after the respondent's visits with Elijah were suspended, these behaviors improved "remarkably," according to Stone.
Although Alexander would not discuss "family business" with Stone, she opined that the bond between both boys and their mother was an insecure, unhealthy bond grounded in the respondent's needs. Although she never worked with the respondent, she posited that the respondent would be unable to care for the boys' needs if they were returned to her. She observed that neither boy wished to return to the respondent's care, though they did wish to continue visiting with her. Stone recommended that the bond between mother and sons be severed.
Dr. Kelly V. Rogers, Ph. D., a licensed clinical psychologist, evaluated the mother in September, 2000, and testified for the petitioner at trial. He found that she has the capacity for reasonable parenting skills and possesses reasonable intelligence. However, she suffers from a paranoid personality disorder. This renders her not only "incredibly rigid" and unlikely to exercise responsible parenting skills but also resistant to treatment. Rogers opined that the mother may also have a delusional disorder which would effect her ability to parent. In his report, Rogers wrote that the mother had "notions of persecution" and "holds principle and her highly idiosyncratic views more dearly than she does her children, and will sacrifice their welfare, accordingly."
Rogers testified further that when the children were in her care, it was likely that they were physically abused and experienced chronic neglect; it was very likely that the current diagnoses of Alexander and Elijah arose from conditions and experiences in the mother's home. Rogers opined that even assuming that the mother had completed certain expectations of the court, such as anger management therapy, a substance abuse evaluation and urine screens, but had failed to disclose such matters to DCF, this, he said, would not alter his opinion that the mother had failed to achieve rehabilitation. Rogers further opined that if Alexander and Elijah were returned to her care, the mother would likely err and fail to nurture them; she would treat them as she had treated Leonard. According to Rogers, although there is a bond between Alexander and the mother, it is an unhealthy bond that ought to be CT Page 11911 severed to alleviate Alexander from any conflict in his loyalties.
With respect to Elijah, Rogers testified that any bond with the mother is more tenuous. While he conceded that the mother was intelligent and had the capacity to parent — in effect a latent capacity to parent — she does not do so consistently. Rather she has consistently demonstrated that she places her own needs above those of her sons. Had additional services been offered the mother, according to Rogers, the mother still would not have rehabilitated.
Rogers opined further that "[a]ny consideration of reunification should be predicated on her full compliance with the substance abuse and psychiatric interventions [he recommended], including compliance with any recommended pharmacotherapy. If she is unable to demonstrate this compliance within six months, it is in the best interests of the children to establish permanent placement outside the family of origin." Rogers also testified that the mother's ability to care for her newborn did not affect the opinions he reached as a result of his September 2000 evaluation, since the skills necessary to care for a newborn differ from those necessary to care for children the ages of Alexander and Elijah.
The mother called Nadine Green as her witness. Green had earned a Bachelor's degree in psychology from the University of Connecticut in 1998. She was employed as a Family Support Worker at Klingberg Family Center (Klingberg) where the mother had supervised visitation with her sons. She began supervising the mother's visits in November 2000, two months after coming to work at Klingberg. At the time of trial she had worked there eighteen months.
Green testified that of the twenty visits scheduled at Klingberg the mother missed only one. The visits were about one hour long; the mother's male friend, Edgardo, also attended most of the visits. The boys did not react negatively to Edgardo in Green's presence.
Overall, according to Green, the mother's visits were good. As she testified at trial, the mother and the children
 usually performed some kind of activity during the entirety of the visit, whether it's Lego, block building activities, arts and crafts, board games or sharing snacks. . . .
 They appeared to have a very positive bond and loving relationship with one another. There was a lot of laughter during visits, They joked, They smiled. If CT Page 11912 ever mom had to discipline the children, it would usually be with a time-out or verbal warning. If the children became upset because of having been disciplined, she would sit them down and talk with them about why they had to be disciplined, and what the behavior was that she was trying to redirect. They were very affectionate. She always asked for hugs and kisses at the end of the visit and also at the beginning of the visit. They just appear to have a really good time during the visits.
Green worked on parenting with the mother during the visits and, according to Green, the mother benefitted from this parenting education. She demonstrated appropriate parenting during the visits and was cooperative with Green. She expressed maternal concern if the children appeared hurt, emotionally or physically, and she expressed affection for them. The mother demonstrated knowledge of the boys' emotional needs. In Green's opinion, the children were bonded to the mother.
Green never heard the mother making negative remarks about the boys' foster parents. Although she was never permitted to contact the boys' therapists, Green opined that the mother demonstrated the ability to parent the children. Green recommended to DCF that the therapists attend the visits. Green advocated for continuing the visits because the children appeared to benefit from them, a recommendation that necessarily was made without her consulting with the children's therapists. The mother was in full compliance with Klingberg's expectations of her. At times the mother would become emotional with the DCF social worker. Indeed, the social worker, Kareem Muhammed, testified that the mother would sometimes verbally abuse him in front of the children. According to Green, Muhammed was always appropriate with the mother.
When recalled to testify, Dr. Rogers stated that Green's account was consistent with his opinion. He reiterated that the mother has the capacity to parent her children but, because of her Paranoid Personality Disorder, absent supervision, she would do so at best inconsistently and to her sons' detriment.
The mother testified in support of her case. She contended, inter alia, that: (1) she got into a fight with Kimberly James in 1998 and was arrested, but it was not her fault, she having never touched James; (2) she got into a domestic dispute with Edgardo and was arrested, but it was not her fault (the mother was convicted of assault); (3) she was charged with larceny for stealing her sister's pocketbook but did not do it, (4) she did not know that there were drugs in the home in which she was CT Page 11913 living at the time of the January 20, 1999 drug raid; (5) she pleaded guilty to failure to appear in court, but it was not her fault that she failed to appear; (6) she tested positive for marijuana in the summer of 1999 after being at a party where marijuana was present, but she did not smoke marijuana; (7) she did not visit her children for seven months[9]
when Alexander and Elijah were placed with her sister Judith because her sister did not want her in her home.
"Failure of a parent to achieve sufficient personal rehabilitation is one of six [now seven] statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. General Statutes [(Rev, to 1999) § 17a-112 (c)(3)(B) . . . [now (j)(3)(B)]. That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to [a] . . . constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) Inre Sheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001).
"Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re DanielC., 63 Conn. App. 339, 357, 776 A.2d 487 (2001). However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In reStanley D., 61 Conn. App. 224, 230, 763 A.2d 83 (2000); see In re LatifaCT Page 11914K., 67 Conn. App. 742, 748-49, 789 A.2d 1024 (2002).
In summary, the court is confronted with a mother who has a history of neglect, who at all times has suffered from a Paranoid Personality Disorder that prevents her from exercising her inherent ability to parent her sons, who failed to visit them for nine months when they were placed with her sister, who failed to engage in services to which she was referred (except supervised visits that had a parenting component and a substance abuse screen for which she tested positive), who claims to have engaged her own chosen services which she failed to disclose until trial, who failed to provide releases to DCF and who provided the court with enigmatic testimony.
The court has weighed the testimony of Nadine Green. To the extent Green purported to offer expert opinion, her testimony was afforded little weight by the court because she has little formal education in child development or experience. To the extent she testified as a lay, or fact, witness, her testimony is substantially credited by the court. However, as Dr. Rogers testified, her observations are not inconsistent with his conclusion that the mother has the inherent ability to parent her children but is prevented from doing so, at least when not supervised, by her Paranoid Personality Disorder. "The testimony of professionals is given great weight in parental termination proceedings. . . . It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony he reasonably believes to be credible. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . ." (Citations omitted; internal quotation marks omitted.) In re Carissa K.,55 Conn. App. 768, 781-82, 740 A.2d 896 (1999); seeIn re Deana E., 61 Conn. App. 197, 208, 763 A.2d 45 (2000), cert. denied, 255 Conn. 941, 768 A.2d 949 (2001).
Notably, both Alexander and Elijah have special needs. As the expert evidence establishes, the children have Post Traumatic Stress Disorder resulting from the time they were in their mother's care and their traumatic removal in the drug raid. Alexander also has an Oppositional defiant disorder and is obsessive compulsive. Both have recently had serious behavioral problems.
As of the date of the filing of the petition, the mother clearly had not gained the ability to care for the particular needs of the children CT Page 11915 at issue. Thereafter, she was in prison. It is true that when her apartment was inspected late in 2001, it was an appropriate home and there was no evidence of drug use. Also, as observed supra, the mother was caring appropriately for her newborn child. However, the test for rehabilitation is not whether a parent can care for another child of another age and needs; In re Sheila J., supra, 62 Conn. App. 481-82; but whether she has gained the ability to care for the particular needs of the children at issue. Her paranoid personality disorder continued unabated and untreated, as evidenced by her refusal to cooperate with DCF and, indeed, her outright and unwarranted hostility to DCF social workers.[10]
By clear and convincing evidence, the court finds that Alexander and Elijah have previously been found to have been neglected and uncared for and that their mother has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the children, she could assume a responsible position in their lives.
 III
DCF seeks to terminate the parental rights of the respondent fathers on the grounds that they have abandoned their respective sons and have no ongoing parent-child relationship with them.
"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes 17a-112 (b)(1) [now § 17a-112 (j)(3)(A)] defines abandonment as the fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . .
"[Section 17a-112 (j)(3)(A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." . . .
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) CT Page 11916 express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted.) In re Deana E.,61 Conn. App. 185, 193, 763 A.2d 37 (2000).
General Statutes § 17a-112 (j)(3)(D), moreover, "provides that the court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that `there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . .'
"`This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent. . . . Feelings for the natural parent connotes feelings of a positive nature only." (Citations omitted.) In re Jonathon G.,63 Conn. App. 516, 525, 777 A.2d 695 (2001).
The whereabouts of both fathers has been unknown since the children were taken into DCF's custody in January 1999. Neither father has had any contact with his son during that time. Neither child has any memories of his father. By clear and convincing evidence, the court finds that neither respondent father has an ongoing parent-child relationship with his son and that each respondent father has abandoned his son.
 IV A. Mandatory Findings
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interests of the child." (Internal CT Page 11917 quotation marks omitted.) In re Ashley E., 62 Conn. App. 307, 315,771 A.2d 160, cert. denied 256 Conn. 910, 772 A.2d 601 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev, to 1999) § 17a-112 (d) [now § 17a-112 (k)]." (Footnote omitted; internal quotation marks omitted.) In re Deana E., supra,61 Conn. App. 190.
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
Both before and within a reasonable time after Alexander and Elijah were removed from their mother's custody, DCF offered services designed to address the mother's drug and psychological problems, including drug screening and evaluation, individual therapy, counseling and anger management.
The whereabouts of the respondent fathers has been unknown since the children were taken into custody by DCF. DCF, therefore, was unable to offer services to them.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
DCF made reasonable efforts to reunite the mother with the children who are the subject of this petition. DCF was unable to make such efforts with respect to the respondent fathers because their whereabouts has been unknown since the children were taken into DCF's custody, despite DCF's efforts to locate them.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
No court orders were entered with respect to the respondent fathers.
The specific steps or expectations for the mother required her to: a. "Keep all appointments set by or with DCF. Cooperate with DCF home visits announced or unannounced. . . ." The mother failed to keep appointments scheduled by DCF with service providers. In 2001, she refused to allow a DCF social worker into her home once. On a later date, she did allow him CT Page 11918 into her home.
b. Keep your whereabouts known to DCF. Between April and September 2001, the mother failed to keep her whereabouts known to DCF.
c. Participate in counseling and make progress toward the identified treatment goals of individual and family counseling. The mother failed to comply with this requirement.
d. Submit to substance abuse assessment and follow recommendations regarding treatment. Except for one drug test in August 1999 that was positive for cannabis, the mother has failed to comply with this expectation.
e. Sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings before this court. The mother refused to comply with this expectation.
f. Secure and maintain adequate housing and legal income. The mother's whereabouts was unknown for several months in 2001. However, DCF failed to prove that the mother did not comply with this expectation.
g. No substance abuse. In August, 1999, the mother had a drug screen that tested positive for cannabis. Since that time, DCF has been unable to determine if the mother continues to use illegal substances because she refuses to attend drug tests or sign releases.
h. Visit the children as often as DCF permits and demonstrate appropriate parent/child interaction during the visits. The mother did not consistently visit her children in 2000. Her visitation in 2001 was generally consistent. However, she tended to argue with the social worker for the last fifteen minutes of the visit in the presence of the children.
i. No involvement with the criminal justice system. The mother was incarcerated in 2001 as a result of offenses she committed in 1999.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Although the evidence was conflicting with respect to this question, CT Page 11919 the court finds that mother and sons have an unhealthy, or insecure bond. That is, the bond is not based on the mother's caring for the children's needs, but on the children's desire to protect and care for the mother's needs and to conceal information about their histories that the mother has instructed the boys not to divulge.
Despite some evidence to the contrary, the court finds that the foster mother and her fiancé are the children's psychological parents. "`A psychological parent is one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent, as well as the child's physical needs. The psychological parent may be a biological . . . adoptive, foster, or common-law parent, or any other person. . . .' J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of the Child (1979) p. 98." Temple v. Meyer, 208 Conn. 404, 408 n. 3, 544 A.2d 629
(1988).
The children love their foster mother and she loves them. There is a healthy bond between them. The foster mother wishes to adopt them.
5. Finding regarding the age of the child.
Alexander is 8 ½ Elijah is 7 years old.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
Although the mother has visited her children with fair consistency, she has otherwise failed to address her mental health problems and, therefore, has not adequately adjusted her circumstances, conduct or conditions to make it in the best interest of the children to return them to her home in the foreseeable future.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
CT Page 11920
Neither the mother nor the respondent fathers has been prevented from maintaining a meaningful relationship with his or her child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by his or her economic circumstances.
 B.
"The trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203,208, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791
(2000). What is clear, however, is that the focus must be on what is best for the child, not on what is best for the parent. Cf. In re Bruce R.,234 Conn. 194, 206, 662 A.2d 107 (1995) (discussing best interests in the context of a consenting parent). "The best interests off the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re Shyina B., 58 Conn. App. 159, 167,752 A.2d 1139 (2000). "In addition, the genetic bond shared by a biological parent and her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider. . . ." (Internal quotation marks omitted.) In re SavannaM., 55 Conn. App. 807, 816, 740 A.2d 484 (1999).
As discussed supra, the mother has not adequately addressed her personal problems. The bond that she has with her sons is an insecure, unhealthy bond. The children miss her and worry about her but do not wish to live with her. The boys have special needs. Their foster mother, who has provided them with a loving home, wishes to adopt them.
Stuart Battle, a worker for the Village for Children and Families, and who holds a Masters Degree in Social Work, recommended that visits between mother and children cease because of the children's adverse behavior after visits.
Denise Stone holds a Masters Degree in Social Work and is working on her doctoral thesis. She is employed by Coventry House. Stone related that once visits by the mother stopped, the children's behavior improved. She recommended that the children be adopted.
In September 2000, Dr. Rogers opined that if the mother did not achieve CT Page 11921 rehabilitation within six months the children should be afforded permanency elsewhere. At the time of trial, he opined that if she had not complied with the services to which she had been referred, the children should be given permanency apart from her. As stated supra, "[t]he testimony of professionals is given great weight in parental termination proceedings. . . ." (Citations omitted; internal quotation marks omitted.)In re Carissa K., supra, 55 Conn. App. 781; see In re Deana E., supra,61 Conn. App. 208. And, as the court has already found, the mother has not achieved rehabilitation nor has she complied with the services to which she has been referred.
While the testimony of Nadine Green evidences that the mother is capable of interacting with her sons in a healthy and appropriate manner when she is supervised, Alexander and Elijah need more than just a visiting resource. They need, they express that they want and there is every reason to believe that they will achieve permanency and stability in the home of their current foster and preadoptive mother.
By clear and convincing evidence the court finds that it is in the children's best interests that the respondents' parental rights be terminated.
 V
The petition is granted. The court terminates the respondents' parental rights. The Commissioner of the Department of Children and Families is appointed statutory parent for Alexander and Elijah for the purpose of securing a permanent adoptive family for them. The foster mother shall be afforded the first opportunity to adopt the children. The commissioner shall file with the court no later than 30 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Dated at Middletown this 23rd day of September, 2002.
BY THE COURT
Bruce L. Levin Judge of the Superior Court